IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

JAMES N. PATNAUDE,

     Plaintiff,

                                      Civil Action No. 05-345-SLR

     v.

ALBERTO GONZALES, ATTORNEY
GENERAL-U.S.DEPARTMENT OF
JUSTICE, and FEDERAL BUREAU OF
INVESTIGATION,

     Defendants,

**PLAINTIFFS' RESPONSE TO UNITED STATES DISTRICT JUDGE SUSAN L.
ROBINSONS ORDER DATED 31 JULY 2006**

                                                  By: James N. Patnaude
                                                  Pro Se
                                                  P.O. Box 7971
                                                  Newark, Delaware 19714
Dated: August 31, 2006                          (302) 584-5675



FILED

AUG 3 1 2006

U.S. DISTRICT COURT
DISTRICT OF DELAWARE

## AFFIDAVIT OF JAMES N. PATNAUDE

The affiant upon his oath deposes and says:

1.    I currently reside at 19B O'Daniel Avenue, Newark, Delaware 19711 (for
      receipt of court related documents my mailing address being P. O. Box
      7971 Newark, Delaware 19714. This is because of impending move).  I
      am the plaintiff in this action.  I was employed by the Federal Bureau of
      Investigation (FBI) as an Intelligence Research Specialist working in the
      Baltimore Division from 2/16/99 to 11/11/04.

2.    The gist of my lawsuit is 1)   that I seek the return of my job with the FBI
      from which I was terminated via Federal Express letter received on
      November 11, 2004.  Other counts have been included in my complaint;
      the original complaint is for wrongful termination.  I strongly feel that I was
      discriminated against by the Bureau in terms of sex discrimination and age
      discrimination.  This was why I included those counts in my complaint.
      This part of the suit is basically a wrongful termination suit.  Regardless of
      the outcome of the EEOC and the DOJ Adjudication Unit, I believe that
      only the U.S. District Court has jurisdiction over wrongful termination;
      2) Reckless Endangerment/Gross Negligence for being needlessly
      exposed to a highly toxic substance 3)Unfair Hiring practices and 4) Other
      Charges.

3.    The alleged basis for my termination was mishandling of documentation.
      More specifically, I took home various documents related to my preparing
      a response to a ninety (90) day Warning Performance Appraisal Review
      (PAR).  In addition, I took home documents related to my EEO complaint
      because a co-worker had advised me that the previous Friday evening my
      desk was being searched by the Supervisory Special Agent (SSA)
      K. Jordan and other individuals. The co-workers statement differs greatly
      from the message he left on my voice mail (Please See Exhibit 1). I
      believe voice mail records may still be available but they have never been
      made available to me. If my co-worker had not told me I would have had

1

no other way to know that SSA Jordan had been searching my desk. SSA Jordan is one of the persons named in my EEO complaint. I intended to formulate a response to the 90 day Warning PAR. I was given a short deadline for reply. To the best of my recollection I was notified of the required short duration to respond by either SSA Jordan or Supervisory Intelligence Research Specialist (SIRS) T. Tamburrino. I also took home some of my EEO complaint related documents which I had filed alleging sex and age discrimination. (Subsequently, an additional count of reprisal was added to the complaint by the EEO Unit at FBI Headquarters. This was done because the Baltimore Division apparently failed to forward my complaint to FBI Headquarters (FBIHQ) in Washington D.C. according to the EEO Unit) .

4.    Initially, my matter was investigated by the Baltimore Division. I was never interviewed by any member of the Baltimore Division nor did I receive any information or have contact with anyone from the FBI until approximately the end of December, 2002. Upon the conclusion of the Baltimore Division's investigation (Please See Exhibit 2), another investigation was performed by the Office of Professional Responsibility (OPR), the FBI version of Internal Affairs. During this period my security clearance was suspended (Please See Exhibit 3). The Baltimore Division had interviewed sixteen (16) FBI employees and five (5) members of the volunteer fire company that I am a member of. The plaintiff is under the impression, based upon discussions with two (2) OPR investigators on June 26, 2003 (Please See Exhibit 4) that at least the sixteen (16) FBI employees were interviewed again. The results of their investigation were forwarded to the OPR Adjudication Unit. The Adjudication Unit made a determination that a five (5) day suspension was warranted (Please See Exhibit 5). At the conclusion of the OPR investigation, the OPR supervisor overseeing the investigation said to me, "In his opinion, this was nothing but a grudge."

5.    Prior to my five (5) suspension being implemented and without any further process or procedure that I am aware of FBI Security Division revoked my

Security Clearance. The OPR Adjudication Unit to their credit attempted to expedite their report and forward a copy to the Security Division. My point of contact at the OPR Adjudication Unit expressed her surprise that the Security Division would take any action prior to the receipt of their final report.  Since a Top Secret security clearance is required to work at the FBI, I could no longer function in my job.  On November 11, 2004, I was dismissed from the FBI for failure to have the necessary security clearance to perform my job.

6.  To put the Adjudication Unit's recommended five (5) day suspension in perspective, a FBI employee who uses a Bureau car on a personal errand is suspended for thirty (30) days.

7.  I appealed my security clearance revocation (Please See Exhibit 6) with the Security Division and was informed by letter dated March 18, 2004 from Charles S. Phalen, Jr, Security Programs Manager that my request for reinstatement was denied. My Phalen is a Central Intelligence Agency (CIA) employee that was recently loaned to the FBI. (This information is readily available on the FBI website and therefore is not a breach of any security restriction.) Included in this letter was the following paragraph, " If you disagree with this security decision, you have the right to file a request for any documents, records, reports, including the entire investigative file, upon which the revocation is based. A copy of the information requested will be provided within 30 days of the request to the extent such information would be provided if requested under the Freedom of Information Act."  While I was still corresponding with Mr. Phalen regarding my appeal and further appeal rights I received a letter from him date July 15, 2004 with a few enclosures (Please See Exhibit 7).  These enclosures were basically summaries of the Baltimore Division investigation as provided in Exhibit 2 and did not include any detail. I made several requests for additional detail and received no additional information (Please See Exhibit 8).

8.    It is the Plaintiff's opinion that Mr. Phalen's decision was made purely for political purposes. After the Baltimore Division's investigation and the OPR investigation there should have been no doubt that the original acquisitions were either grossly overstated or misstated or outright lies. As indicated in the second paragraph of Mr. Phalen's July 15th letter in Exhibit 7, he could not even accurately cite the supposed evidence correctly. For suspensions and/or revocations that occur so infrequently, 12-15 as noted in the statement given in Exhibit 3, details do not appear to matter to Mr. Phalen.

9.    An Administrative Hearing was held by the Access Review Committee, a unit within the Department of Justice.  This forum hears all matters involving security clearances.  Prior to that hearing, I had requested the 302's (documentation of an interview), all tapes, recordings, e-mails and other related documentation of the  witnesses interviewed both by OPR and by the agents of the Baltimore Division that initially interviewed all relevant co-workers prior to having the matter forwarded to OPR. My requests for additional information contained in Exhibit 8 and made in telephone conversations with the Committee Chair of the ARC were either not answered or denied.  I submitted my argument for reinstatement to the ARC as instructed (Please See Exhibit 9).

10.    In spite of the fact that I had made discovery requests of the FBI and ARC as noted above, I received no additional information by the time the hearing began.  With that additional information I can prove without a doubt that all the allegations made against me by the Baltimore Division are not supported by the investigation and reports of the OPR or the Baltimore Division. The following instances are noted as examples:

11.    To this day I have never received an inventory of items taken from me when my vehicle, personal belongings and person were searched. I was told that my desk would be searched that evening.  I have never received an inventory for any location. ASAC Lewis and SA Faust immediately started to commingle and separate documents after I was searched. First,

had they recorded and cataloged the material in the manner normally utilized when performing a search it would have been obvious what I was taking home and why. The effectively were able to muddy the waters by their unprofessional and unethical methods. To this day, I believe that items were taken from my desk that I am being accused were taken from vehicle and my person. These inventories are crucial to my defense. The basis for the search warrant was that I was "conveying documents to an unnamed party outside the FBI." I have never had the opportunity to review any documents related to this alleged conveyance nor have I ever been asked about this alleged conveyance by anyone.

12.    In its brief, the U.S Attorney's Office – Delaware Division alleges that my complaint should be dismissed for failure to exhaust all administrative remedies. It further alleges that the dismissal of the EEOC complaint because of my failure to meet court requirements is an indication of bad faith. As the court recollects previously in this matter, I admitted to be suffering from undiagnosed and untreated anxiety and depression during the beginning of this litigation. Unfortunately this condition probably started around the time of my initial suspension. The reasons for my failure to meet the deadlines at the EEOC were the same. During this three year period, and subsequent to my firing, my wife initially separated and then divorced me because of the stress induced by the accusations made by the FBI. There were times during the period of the EEOC hearing that I was too exhausted to perform normal daily functions and paralyzed with fear. I was not able to contemplate or take effective action in the litigation. I made the best effort possible that I was capable of at the time. Without a job, I was unable to retain legal counsel on my behalf. It was only later on after I was diagnosed and treated for depression and anxiety. I have been on medication for nearly a year since being diagnosed.

13.    Regardless, of the disposition of the EEOC case, which was dismissed with prejudice, I do not feel it should have a bearing on this action. In the

5

very beginning of the EEOC case, the Administrative Judge during a telephone conference call with the FBI representative and myself, indicated she had no jurisdiction or authority to reinstate me to my position in the FBI regardless of the outcome of my suit.   As I said in the very beginning of this affidavit, the gist of my suit is wrongful termination.  It is my understanding that only the U.S. District Court has jurisdiction over this matter.

14.    The court must grant me the opportunity to pursue my wrongful termination case.  I was fired as a result of my filing and EEOC complaint. I was not fired for mishandling documents.  Any inadvertent mishandling of documents was only a subtext of the retaliation.  Through discovery and with the assistance of a lawyer, (because this case is truly about credibility) I have no doubt that I can prove that I have been wronged and wrongfully terminated.  There are a number of instances in which the credibility of my accusers has been exposed during the course of the events leading up to my termination.

A.    The statement given by Special Agent (SA), Stacy Bradley stated that on several occasions she approached me about mishandling documents.  In addition, in that same statement, she accused Unit Chief (UC) Jorge Martinez of also being made aware of this alleged mishandling.  UC Martinez and his Section Chief challenged the veracity of SA Bradley's statements and UC Martinez and his Section Chief were assured by Assistant Special Agent in Charge (ASAC) Brust that it was not their intention to allude to any such wrongdoing. SA Bradley had previously made unsuccessful charges against UC Martinez that were investigated by OPR.  During the ARC hearing I offered to be polygraph to verify that I had never had

6

any such conversations with SA Bradley. My request was denied.

B.   In an interview of SIRS Tufts (Please See Exhibit 10) she states that she drafted a document of a conversation we had when I left the unit. During my OPR interview I was informed that she had stated such but never produced the document for OPR. In their opinion it did not exist. In addition, there is no documentation or support that I was supposedly told not to take work out of the office.

C.   SIRS Tufts indicated that I required extensive supervision. All my evaluations from Tufts contained excellent ratings in all three categories. There was never any mention for the need for additional supervision; all comments contained in the evaluations were of a positive nature. SIRS Tufts PAR's were taken from me on the night my belongings were searched and were the only PAR's not returned to me.

D.   The very basis for the affidavit seeking a search warrant of my home, vehicle and desk alleged that I was in the process of "conveyance of documents." This was an absolute lie. I do believe that the FBI would have never gotten a search warrant based on the facts of this case. Once again, I believe certain people in the Agency will do anything regardless of the truth to retaliate against some of there fellow employees. There has never been any mention of conveyance to me by OPR or even when AUSA Warwick threatened me with prosecution.

E.    SIRS Tamburrino has a documented history of
      fabricating derogatory material she has put in some
      employees PAR's. None of the statements made by
      her have been made available to me to defend
      against.

F.    SAC Lynn Hunt said she was not aware of my EEO
      complaint until she was advised by SSA Jordan. The
      division counsel reviewed documents submitted on
      3/12/02 for release to support EEO Complaint.
      (Please See Exhibit 11)   Chief Division Counsel, SA
      Robert Chamberlain responded on 4/22/02 to request
      these documents through EEO at Headquarters.
      (Please See Exhibit 12). SA Chamberlain assured me
      that a copy of every document he sends out under
      SAC Hunt's signature is forwarded to and reviewed by
      her.  In addition, SAC Hunt indicated that she only
      became aware of my alleged performance problems
      after SSA Jordan approached her at range practice.
      Yet I had requested a Freedom of Information-Privacy
      Act request to have my personnel file reviewed. I
      received a response on February 14, 2002 from SA
      Chamberlain (Please See Exhibit 13). He signed for
      SAC Hunt at this time and advised me that a copy is
      always forwarded to SAC Hunt. This would conflict
      with the statement she gave the EEO investigator.

G.    Joan Carlton, a member of the Career Board for the
      GS-12 position I applied for informed me via
      telephonic communication that I did not get the
      position because of my attitude.  This is the contrary
      to the statement that she gave the EEO Investigator.
      The EEO Investigator did not interview one member of

the Career Board that I specifically asked the interviewed when the case what opened by the EEO Investigator.

H    The Access Review Committee notes that I did voluntarily enter an FBI Information Technology system for the express purpose of removing sensitive FBI information and converting this information for my own personal use and gain. In addition there were acquisitions that I had encryption, "wiping" and steganography programs on my hard drive. The hard drive that this information supposedly contained was returned "fried." This statement was proven false after the drive was reconstituted and independent forensic computer examined was made of the repaired drive. (Please See Exhibit 14). The return of the hard drive in an unusable condition was an attempt to accuse me of possession of documents and programs that I did not have and prevent me from being able to refute this claim.

I.    SA Jeffrey R. Williams, in a sworn statement (Please See Exhibit 15) stated that he was not satisfied with my work, that SIRS Tamburrino did not request him to sign a document that she had prepared complaining about my work and that I had requested he sign a document stating he was satisfied with my work. This is a bold face lie. I had updated SA Williams with a document dated 01/03/2001 (Please See Exhibit 16) and constantly requested feedback from SA Williams. In addition, SA M.Vilchek, who I had worked with on the Innocent Images squad, had approached SA Williams on my behalf to make sure there were no

problems. SA Williams informed SA Vilchek there were none. Lastly, SA Williams supervisor at the time, whose last name I do not currently have available, specifically instructed him not to approve any documents drafted by SIRS Tamburrino. I have not had access to either SA Vilchek or SA Williams supervisor to refute his lies.

J.    Exhibit 17 discusses the Senate Judiciary Committees investigation of SA Jennifer Smith Love. SA Love was intimately involved in the investigation into my matter. As is noted in the article this is not the first time SA Loves' conduct has been questioned. SA Love tried to contact my former wife after my security clearance was revoked with the intent of creating friction. I was not aware of this until my former wife contacted me and told me that that was her impression of the reason for the telephone call. SA Love could not get in touch with my former spouse on the Friday that the revocation was given to me. SA Love called her again on Monday trying to "stir the pot" not knowing that I had already informed my former spouse. I am sure that SA Love had some input in the revocation of my security clearance because her previous assignment was with OPR which interacts with Security Division on a regular basis.

K.    In Exhibit 18, on page five (5) in the fifth paragraph, I describe the interaction between myself and Administrative Officer (AO) Mosebach. I had approached the AO to describe the situation I was experiencing with SIRS Tamburrino. As indicated in the document before I could complete my sentence he

10

guessed that there was a problem with SIRS Tamburrino. The AO indicated that there had been other problems previously and that he felt SSA Jordan would not follow up. He offered to speak to ASAC Lewis. I received an e-mail from the AO and called him at home regarding its content. He said I better think twice about speaking to the ASAC because of comments made to him by SSA Jordan. These comments are in conflict with a sworn statement AO Mosebach gave to the EEO investigator (Please See Exhibit 19). I have not had the opportunity to have these discrepancies investigated. I then telephoned SSA Jordan at home. SSA Jordan essentially had a temper tantrum during the conversation and said "I won't forget this. I'll take this to the mat" I considered this a threat. The next week I was away at training. Upon my return I received a document authored by SSA Jordan complaining about my performance (Please See Exhibit 20). From this point on SSA Jordan assumed the role of "Rating Official "instead of "Reviewing Official" I can only assume he did so to carry through on his threat.

L.    The supposed no work at home policy is also an outright lie. There are numerous employees who take home work on a regular basis. Computers were always available to sign out on the Innocent Images Squad as well as in the Woodlawn Office. One Terrorism Squad Supervisor let an employee do work at home on his personal computer because it was better equipment then the FBI had. I will gladly provide a list to the court of persons I know to do work at

home on a regular basis. I am hesitant to provide such a list now because of probable retaliation by the FBI against these dedicated employees.

M.      Lastly, documents note that my supervisor expressed a concern about my alleged mishandling of documents prior to the events of 9/11. Yet after 9/11 I was deployed to the Pentagon were I cleared highly classified documents from SKIFS and recovered highly classified materials. In addition, my level of security clearance was increased so that I may work on certain sensitive projects. The documents requesting and granting this increased security level are in the possession of the FBI. This reinforces my claim that the charges were just a form of harassment.

15. The Assistant United States Attorney wrongly states that I, the Plaintiff was injured while deployed as a member of a Hazardous Materials Response Team. My claim is that I as well as all other team members were needlessly exposed to anthrax because Director Robert S. Mueller III specifically instructed the Hazardous Material Response Unit (HMRU) management that he did not want see any more FBI personnel "suiting up" on the news. This was communicated to the team by the HMRU briefing officer the night before operations began in office space borrowed by the FBI Newark Division.  Per the Occupational Safety & Health Administration (OSHA) the release chemicals or hazardous substances whether it is caused by an accidental release or by a terrorist event is considered a hazardous materials incident. Emergency responders and workers performing remediation efforts, which would include personnel gathering evidence, fall under 29 CFR 1910.120. Per OSHA's "Model Health and Safety Plan for Clean Up of Anthrax Spores, which would also include evidence collection, there has to be an Exclusion Zone, a Contamination Reduction Zone, and a Support Zone. This essentially corresponds to the HMRU Standard Operating

Procedures (SOP's) which call for a Hot, Warm and Cold zones. HMRU
SOP's are structured to comply with 29 CFR 1910.120. These zones
are designed to allow personnel to don protective clothing and equipment at
a distance that eliminates exposure to the hazard. The fact that the FBI
Director ordered that the SOP's be violated constitutes a violation of the law.
These SOP's were not ignored at any other site that was processed by FBI
personnel nor were they suspended under the National Response Plan.
I am not seeking additional compensation for my exposure to anthrax unless
there are adverse conditions that arise later. The anthrax releases in 2001
resulted in deaths at far lower doses then previously thought. The plaintiff has
no knowledge at this time that any studies have been done to determine if
there are any long term effects as a result of exposure to the type of spores
released. The plaintiff wants to assure that FBI personnel are no needlessly
exposed to hazards in the future for the sake of media control by FBI
management. The plaintiff has copies of the HMRU plan which includes
diagrams of the areas searched and the close proximity that personnel
donned their equipment in. I am not comfortable putting SOP's of HMRU
available in the public domain. Any guidance the court can provide to comply
with disclosure but protect practices would be appreciated by the plaintiff.

16. The Plaintiff is alleging discrimination based on the indiscriminate,
inconsistent and haphazard application of the requirements to be hired for
the position of Special Agent. The plaintiff had applied for the position of
Special Agent and was initially turned down because of a color vision
deficiency. The Plaintiff appealed this decision to no avail and was advised
those exceptions are never made. The Plaintiff made another attempt by
contacting former Director Freeh upon his appointment. (Please See
Exhibit 21) The response to my request was denied (Please See
Exhibit 22) This process occurred before the Plaintiff was employed by the
FBI. Almost immediately upon becoming an employee of the FBI the Plaintiff
became aware of numerous Special Agents that had the same color vision
as I and other conditions that according to recruiting literature would

eliminate an applicant from consideration.  As previously noted one of former Director Freeh's drivers had a color blindness issue, a hearing impediment, could not pass the polygraph until the third attempt related to drug use and had excessive moving violations prior to his employment with the FBI. The Plaintiff had other examples that were retained in his desk when I was suspended. In addition, the Applicant Coordinator in the Baltimore Division encouraged the Plaintiff to sue the FBI because of the fact that he was denied entry because of color vision. The Applicant Coordinator indicated that exceptions are slipped through all the time. When the Plaintiff was taking his physical for the Hazmat team the doctor performing the exam asked why I hadn't applied to become a Special Agent. I advised the doctor of my color vision and he indicated that they overlook that depending on the applicant. This in direct contrast to statements made by Assistant Director (AD) Welby who was in charge of Special Agent recruiting. AD  Welby bragged at some of the applicants that he had rejected and indicated that exceptions were never made.  To further illustrate the rampant disregard for the supposed "requirements", Acting FBI Director Pickard was discussing the issue with the Plaintiff via e-mail when Director  Mueller came on board and then a week later the events of September 11, 2001 occurred. These e-mails should still be retained within the FBI system. The Plaintiff has additional examples of the wholesale disregard for the standards but they are unavailable to me at this time.

17. The last item noted by the AUSA is that I did not note a single fact to support my claim of discrimination. Exhibit 23 mentions reconsideration request of the original revocation that was filed with the Security Clearance Review Panel (SCRP). I was never advised of such action, never afforded the opportunity to offer evidence or clarification nor provided with a copy of the letter dated July 15, 2004 that is noted in this exhibit.  Additionally, Exhibit 24 notes that a complete separation package will also be forthcoming . I never received any such package and was never informed of any rights or benefits I might be eligible for. Continuing health insurance

benefits should have been offered under COBRA. I received no information or data and found out that I that I no longer had health insurance when I was at a doctor's visit.

18. I respectfully request that the court allow this matter to proceed to a civil jury trial. I strongly feel that I have demonstrated that enough doubt exists in the veracity of statements and supposed facts that were used to effect my termination. The United States has an excellent justice system in place. Unfortunately, the justice system has evolved that significant resources are required to be afforded all the benefits of the system. My current financial position precludes me from retaining the expertise needed. I do not want to be involved in this litigation pro se anymore then the court wants to deal with a pro se litigant. Once again, I respectfully request that this case be allowed to proceed to a jury trial so that I can have my day in court to face my accusers and have the opportunity to review the information used to defame and slander my reputation as well as costing me my career and my opportunity to serve my country.

19. Thank you for your time and consideration in this matter.


Respectfully submitted,

James N. Patnaude

August 31, 2006

# EXHIBIT 1

Baltimore, Maryland

SWORN STATEMENT

I, Stephen J. Gordon, Special Agent, Baltimore
Division of the Federal Bureau of Investigation (FBI), do
hereby solemnly swear to the following:

I have been advised by Supervisory Special Agent
(SSA) Fred J. Gregory of the Office of Equal Employment
Opportunity Affairs (OEEOA) of the FBI, that he is
investigating a complaint of employment discrimination
(F-03-5803) pursuant to Title 29 of the Code of Federal
Regulations, Part 1614.

Through SSA Gregory, I understand that the claimant
is James N. Patnaude, and that the issues under investigation
are whether he was discriminated against based on his sex
(male) and age (44) when 1) sometime after March 27, 2002, he
was advised that he was not selected for the IRS position in
the FBI's Baltimore Division for which he believes that a less
qualified female was selected (Vacancy notice #02-BA-414); (2)
whether he was subjected to harassment (hostile work
environment) on the bases of his sex (male) and age (44),
including but not limited to the following incidents: he was
not assigned high quality case work; a Supervisory IRS made a

Page 1 of __4__ pages                    Affiant's Initials  _____

comment to him that he was a know it all, and that he did not have adequate interpersonal skills; he was assigned work while he was detailed out of state; and a SIRS requested a Special Agent to sign an electronic Communication that complained about his work; and (3) whether he was discriminated against in terms and conditions of his employment on the basis of reprisal for his previous involvement in the EEO process, including but not limited to the following incidents:  he was given a 90 day warning evaluation and placed on administrative leave with pay; on May 24, 2002, his work area was searched; on May 28, 2002, he received an unsatisfactory performance review; on May 30, 2002, his personal belongings and personal vehicle were searched, and most of his belongings were kept; on May 31, 2002, his residence was searched, and his personal computer was seized; and on June 4, 2002, his credentials, building pass, credit card and equipment at his residence were seized.

Name: Stephen J. Gordon

Enter on Duty Date: 05/22/1997

Date of Birth: ████/1969

Gender: Male

Page 2 of  4   pages              Affiant's Initials   SJG

I transferred to the Baltimore Division from the San Diego Division in December, 2000.  I received a Hardship PRL transfer ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮  I was assigned to Squad 21, the same Squad as Mr. Patnaude. Since Mr. Patnaude was a part-time EMT he was familiar with my son's condition.  I became acquainted with Mr. Patnaude on a casual basis.

P-1

The following is my knowledge of issue three of Mr. Patnaude's complaint.  I recall an incident in which I advised Mr. Patnaude about seeing two agents (SAs Tom McNamara and Nicholas Crnkovich) assigned to the Baltimore Division going through his desk.  I thought that these agents going through Mr. Patnaude's desk was somewhat unusual, and I mentioned to him what I had observed.  At the time, I did not know that Mr. Patnaude was under suspicion of removing classified information from the office, which I later found out.   I never observed SSA Kim Jordan searching Mr. Patnaude's desk, and never told him that I observed SSA Jordan doing so.

When I later found out that there had been an investigation involving Mr. Patnaude, I advised my supervisor and Assistant Special Agent in Charge Kevin Lewis that I had inadvertently apprised Mr. Patnaude regarding the search.  I had no role in any of the other issues involving Mr. Patnaude.

Page 3 of _4_ pages                    Affiant's Initials _____

I do not have any knowledge of any additional information that I believe is relevant to the scope of the inquiry as described to me by SSA Gregory.

I have read this statement consisting of four pages. The entire statement is true and complete to the best of my knowledge and belief. I understand that the information I am giving is not to be considered confidential and that it may be shown to interested parties.

_____
Stephen J. Gordon


Sworn to and subscribed before me at Baltimore, Maryland, on this 24 day of March 2004.

_____
SSA Robert W. Chamberlain
SF Chief Division Counsel
Baltimore Division

Page 4 of 4 pages          Affiant's Initials  SJG

# EXHIBIT 2

(Rev. 01-31-2003)

SECRET 

# FEDERAL BUREAU OF INVESTIGATION

Precedence:  ROUTINE                          Date:  04/04/2003

To:  Counterintelligence          Attn:  SSA Tony Wagoner, Rm. 4216
                                          (s)                        A

     Office Professional          Attn:  SSA Lance Fragomelli
         Responsibility                  IIU-II; Room 11861

     Security                     Attn:  SSA Larry Russell, Rm. 4445

From:  Baltimore
       Squad 8; MMOC
       Contact:  SA David B. Williams 301-586-4465

Approved By:  Bald Gary M
              Love Jennifer S
              Lewis Kevin R                    5/5/04
              Evans David H              CLASSIFIED BY: 00247 NLS/DAW
                                         REASON: 14 ( 6 )      kon
Drafted By:   Williams David B           DECLASSIFY ON: X 5/5/2009
                                              CDRU# 04-146
Case ID #:  (U)(S)  65X-BA-102169   (Closed)
                    263A-HQ-1377968

Title:  (S)(U)  JAMES NELSON PATNAUDE;
                ESP-X (UNAUTHORIZED DISCLOSURES)

Synopsis: (U)(S)  To report prosecutive declination and provide
copies of relevant serials.

          (SECRET)  Derived From:  G-3
          (U)       Declassify On:  X1

(U)(S)  Full Field Investigation Instituted:  05/31/2002

Enclosure(s): (U)(S)  Enclosed for OPR and Security are the
following:  declination letter dated 04/04/2003; an investigative
report dated 10/22/2002 (previously provided to FBIHQ, Serial 98)
and case serials 112; 117; 115; 111; 109; 107; 106; 105; 104; 99;
96.

Details: (U)(S)  A security investigation of James Nelson Patnaude,
Intelligence Research Specialist, Baltimore Division, was
initiated in April 2002 when it was reported that he may have

SECRET

Russell  ___
Blanns  ___
Lloyd  ___

ALL INFORMATION CONTAINED
HEREIN IS UNCLASSIFIED EXCEPT
WHERE SHOWN OTHERWISE.

SECRET

To: Counterintelligence  From: Baltimore
Re: (U)(S)  65X-BA-102169, 04/04/2003

removed FBI files or documents from the Baltimore office.  On
5/30/2002, he was observed removing FBI documents from his work
area and departing the building at the end of his work day.  A
search, by his consent, of a backpack, gym bag, and his personal
vehicle located FBI documents, some of which were classified
"SECRET," and eight 3.5" computer diskettes containing FBI
documents, some of which were classified "SECRET."  On 5/31/2002,
a full espionage (unauthorized disclosure) investigation was
initiated and a search warrant was executed at his residence.
Two computers were seized, along with a variety of removable
electronic media.  Subsequent investigation included technical
analysis, interviews, record reviews, and data base audits.
During the examination of the removable electronic media, it was
determined that one ZIP disk, found at his residence, contained
child pornography images.  The images were examined by a Special
Agent assigned to the Innocent Images Initiative (III).  It was
determined, by a search of the III database, that some of the
images were those of documented minors.  Based upon this
discovery, a child pornography investigation (classification 305)
was opened.

(U) (S)  During the espionage investigation, it was learned
that subject had been also utilizing computers with internet
access belonging to the Newark, Delaware Fire Department.  The
Newark Fire Department voluntarily allowed the FBI to conduct a
comprehensive analysis of the hard drives of their computers.

(U) (S)  Baltimore's investigative report listed several
leads pending.  The disposition of those leads is as follows:

Lead 1.  Subject's FD-140 (Report of Foreign Travel)
was not located in subject's FBIHQ file; however a reference to
foreign travel was contained in his background investigation
indicating pre-employment travel to Canada, West Germany, United
Kingdom, Wales, and Ireland.
Lead 2.  Subject's pre-employment polygraph report
could not be located at FBIHQ or Baltimore.  A reference to that
report revealed that subject successfully underwent pre-
employment polygraph examination.
Lead 3.  No pertinent information revealed.
Leads 4, 5, and 6.  The report issued following an
exhaustive analysis advised that no evidence could be located
regarding the acquisition, storage, reproduction, and/or
dissemination of sensitive or classified documents belonging to
the Federal Bureau of Investigation.  The complete report is
contained in Serial 104

SECRET

2

SET

To: Counterintelligence  From: Baltimore
Re: (u)(2)  65X-BA-102169, 04/04/2003

          Lead 7.  A subpoena was issued to ███████████████
████████.  No records have been received in response to that
subpoena.

     (u) (2)  A summary of the facts of this matter were
presented to Assistant United States Attorney James Warwick,
District of Maryland.  On 4/3/2003, AUSA Warwick advised that his
office was declining prosecution of captioned subject for any
violations of U.S. statutes concerning the mishandling of
classified information as well as possession of child
pornography.  The decision was made after careful consideration
of all the facts.

     (u) (2)  The Baltimore division hereby closes its espionage
investigation.  A separate communication advising of the
disposition of the child pornography investigation will be
forthcoming from Baltimore's Innocent Images Initiative.  This
matter is therefore being forwarded to the Office of Professional
Responsibility and the Security Division for administrative
action.

          (U)  While employed in the Baltimore Division, subject
asserted EEO and fair employment grievances.  Many Baltimore
employees and several Baltimore managers were aware of, or
parties to, those grievances.  To avoid even the appearance of
bias, or partiality, Baltimore believes that the administrative
investigation in this matter should be conducted by an
investigator from outside the Baltimore Division.  It requests,
therefore, that OPR re-characterize its case as a "non-delegated
investigation."

SECRET

```
To:  Counterintelligence  From:  Baltimore
Re (U)(3)  65X-BA-102169, 04/04/2003
```

LEAD(s):

Set Lead 1:  (Info)

    COUNTERINTELLIGENCE

        AT WASHINGTON, DC

        (U)  Read and clear.

Set Lead 2:  (Discretionary)

    OFFICE OF PROFESSIONAL RESPONSIBILITY

        AT WASHINGTON, DC

        (U)  This matter is referred for administrative action as deemed appropriate.  OPR is requested to re-characterize this matter as a non-delegated investigation.

Set Lead 3:  (Discretionary)

    SECURITY

        AT WASHINGTON, DC

        (U)  This matter is referred for coordination with OPR and action as deemed appropriate.

♦♦

SECRET

# EXHIBIT 3

Washington, D.C.

SWORN STATEMENT

I, Thomas R. Rekus, former Supervisory Special Agent
(SSA) (retired) of the Federal Bureau of Investigation (FBI), do
hereby solemnly swear to the following:

I have been advised by SSA Fred J. Gregory of the
Office of Equal Employment Opportunity Affairs (OEEOA) of the
FBI, that he is investigating a complaint of employment
discrimination (F-03-5803) pursuant to Title 29 of the Code of
Federal Regulations, Part 1614.

I understand that the claimant is James N. Patnaude,
and that the issues under investigation are whether he was
discriminated against based on his sex (male) and age (44) when
1) sometime after March 27, 2002, he was advised that he was not
selected for the IRS position in the FBI's Baltimore Division for
which he believes that a less qualified female was selected
(Vacancy notice #02-BA-414); (2) whether he was subjected to
harassment (hostile work environment) on the bases of his sex
(male) and age (44), including but not limited to the following
incidents: he was not assigned high quality case work; a
Supervisory IRS made a comment to him that he was a know it all,
and that he did not have a adequate interpersonal skills; he was
assigned work while he was detailed out of state; and a SIRS

Page 1 of _6_ pages                    Affiant's Initials _TRR_

requested a Special Agent to sign an electronic Communication that complained about his work; and (3) whether he was discriminated against in terms and conditions of his employment on the basis of reprisal for his previous involvement in the EEO process, including but not limited to the following incidents: he was given a 90 day warning evaluation and placed on administrative leave with pay; on May 24, 2002, his work area was searched; on May 28, 2002, he received an unsatisfactory performance review; on May 30, 2002, his personal belongings and personal vehicle were searched, and most of his belongings were kept; on May 31, 2002, his residence was searched, and his personal computer was seized; and on June 4, 2002, his credentials, building pass, credit card and equipment at his residence were seized.

Name: Thomas R. Rekus

Enter on Duty Date: 02/12/1978

Date of Retirement: 02/28/2003

Date of Birth: █████1954

Gender: Male

S

The Analytical Integration Unit (AIU) was established by the FBI's Security Division circa May 2001 in the wake of Robert Hanssen's espionage activities. Since then, problematic reinvestigations, particularly cases involving employees who hold particularly sensitive positions or have

access to Sensitive Compartmented Information (SCI), are diverted to the Unit, to provide a more focused investigation and deeper analysis to cases posing heightened security issues.

I was the first SSA Unit Chief of AIU, a position I held until my retirement from the FBI in February 2003. During my tenure in AIU, certain authorities of the FBI's Security Program Manger, the Assistant Director (AD) of the Security Division, then, Ken Senser, were delegated to me through the Section Chief (SC) of the Personnel Security Section, then Ed Shubert. One such delegated authority was to sign, for SC Shubert, the letter that notified an employee that their security clearance was being temporarily suspended.

A decision to suspend an employee's clearance was made when specific and articulable facts about an employee's conduct raised a security concern that was significant enough to warrant damage mitigation through the immediate protection of FBI information, FBI information systems, FBI facilities, FBI personnel and/or other FBI assets. When an employee's security clearance was suspended, the employee was placed on administrative leave with pay pending the resolution of the case. This was the FBI policy in every case when an employee's security clearance was temporarily suspended.

The following is my knowledge of issue three. James Patnaude was an Intelligence Research Specialist assigned to the Baltimore Office. He was cleared TS/SCI, with

access to especially sensitive information. An aperiodic reinvestigation of Mr. Patnaude by AIU was predicated upon receipt of information from the Baltimore Division Security Officer (SO) that indicated that Mr. Patnaude had inappropriately removed classified material from the Baltimore Office. Further investigation by the Baltimore SO indicated that Mr. Patnaude had also misused FBI information systems to which he had access.

The initial information was significant enough that Baltimore opened a 65 case identifying Mr. Patnaude as the subject of the espionage investigation. Quickly that investigation developed probable cause sufficient to obtain search warrants for Mr. Patnaude's residence and personal computer. This was a significant case so I kept both SC Shubert and AD Senser well informed.

Mr. Patnaude's conduct and the information developed through investigation raised a significant security concern warranting the temporary suspension of his security clearance. When I proposed this course of action to Ed Shubert and Ken Senser, they concurred. Consequently, AIU staff prepared a suspension letter to Mr. Patnaude dated June 4, 2002 that I signed out over Ed Shubert's signature. This security action effecting Mr. Patnaude was consistent with other security clearance suspensions authorized by the FBI's Security Program Manager and was done to protect FBI information, FBI information systems, FBI facilities, FBI personnel and/or other FBI assets.

I was not aware until advised by SSA Gregory that Mr. Patnaude had previously engaged in the EEO process. Given his name and referred to as "Mr.", I would have concluded he was male. I do not recall being aware of his specific age. While I was the AIU Unit Chief, I would estimate there 12 to 15 clearance suspensions initiated by the unit. I recall they were both male and female employees, Special Agent and Support Employees, and a variety of ages.

I did not take into consideration Mr. Patnaude's age, gender or previous participation in the EEO process when temporarily suspending his security clearance, and him subsequently being placed on administrative leave.

I cannot provide any information about the other issues in Mr. Patnaude's complaint.

I do not have any knowledge of any additional information that I believe is relevant to the scope of the inquiry as described to me by SSA Gregory.

I have read this statement consisting of six pages. The entire statement is true and complete to the best of my knowledge and belief. I understand that the information I am giving is not to be considered confidential and that it may be shown to interested parties.

_Thomas R. Rekus_
Thomas R. Rekus

Sworn to and subscribed before me at Washington, D.C., on this 6th day of April 2004.

_____
SSA Fred J. Gregory
EEO Investigator

Page 6 of 6 pages                    Affiant's Initials _TRR_

# EXHIBIT 4

Wilmington, DE
June 26, 2003

I, James N. Patnaude, having been duly sworn by Supervisory Special Agent (SSA) Marcus M. Williams, hereby make the following statement to SSA Marcus M. Williams and SSA John J. Blake, who I know to be SSAs of the Federal Bureau of Investigation assigned to the Phoenix Division and San Diego Division, respectively.

I entered on duty (EOD) on 2/16/1999, as an Intelligence Research Specialist (IRS) in the Baltimore Division. I currently hold this position, though I have been on administrative leave since 5/30/2002.

I understand that this is an administrative inquiry regarding an allegation that I made an unauthorized disclosure of information from FBI investigative files; and that I violated security procedures by removing investigative files from the Baltimore Division. I have been advised of my rights and responsibilities in connection with this inquiry as set forth on a "Warning and Assurance to Employee Required to Provide Information" form FD-645 which I have read and signed. I understand from my review of the FD-645 that should I "refuse to answer or fail to reply fully and truthfully" during this interview, which I further understand would place me in violation of the Director's "Bright Line" pronouncement, I can expect to be dismissed from the roles of the FBI.

My father was employed as a Special Agent for the Internal Revenue Service. I was studying engineering in college and came to the realization that I was not well suited for a career engineering. I considered pursuing a career as a fire fighter or joining the U.S. Marine Corp. At my father's suggestion, I took up the study of accounting in order to prepare myself for a career as an FBI agent. I graduated with an accounting degree, held several jobs in the accounting profession and passed the CPA exam. I worked for several years for the accounting firm Price Waterhouse until I went back to graduate school. I received an MBA from Rutgers University, then held several jobs primarily as a consultant.

I had applied to the FBI for the position of Special Agent on two occasions. The second time, I progressed part way through the selection process. However, as I have limited ability to see certain shades of green, I was denied the job. I attempted to appeal directly to the FBI Director to amend the policy which disqualifies candidates with color blindness but was unsuccessful in effecting this change.

In 1998, I learned of openings for the position of IRS and I applied. It took approximately one year to navigate the process but I was eventually hired. My initial assignment was to the Baltimore Division, Maryland Metropolitan Office of Calverton (MMOC), working on Squad 21 under Supervisory Special Agent (SSA) Jorge Martinez. This squad was the Innocent Images Initiative (III) which investigated on-line distribution of child pornography. I was very motivated and gave 110% to my work. I received an "Exceptional" on my performance appraisal as well as two time-off awards, a cash award, and an award from the National Center for Missing and Exploited Children.

I was passionate about my work, particularly because I have two young daughters. I felt compelled to be very responsive to agents, fellow IRS's, and outside law enforcement officers working child pornography and other cases involving the sexual exploitation of children. Although I was assigned to handle inquiries and case initiations from the Atlanta, Jacksonville, and Birmingham Divisions, I would not hesitate to offer advise or assistance to any division in need of help. Frequently, a page would be heard, "would any squad 19 or 21 personnel pick up line _" If I was at my desk, I would never hesitate to answer the call and do whatever was needed. I felt that it was my job.

As I was better educated than most of the IRS's, had more than 15 years of personnel supervisory experience, had extensive knowledge of computers, had experience as a EMT, fire fighter and HAZMAT responder, and had been involved in training in my previous employment, I participated in a number of assignments that most other IRS's did not. These included making training presentations, accounting for undercover projects, and liaison.

My extra duties and willingness to help other field divisions caused some friction between myself and other IRS's working in office. I wasn't overly concerned since I felt that many of the IRS's did not have the level of motivation or work ethic that I had. On two occasions, SSA Martinez and SSA Janice Penegor, who succeeded him as supervisor on squad 21, discussed this friction with me. Both times I ask the direct question, "do you want me to stop?" Both times the response from the SSA was no. In order to maintain my high level of responsiveness, I found it necessary to occasionally take work home to do in the evenings or on weekends. That was sanctioned by SSA Martinez and later by SSA Penegor. All work was done on a laptop computer assigned to the III.

In 2001, a Supervisory IRS position was posted in the MMOC. I applied, along with Susan Tufts, and Rick Stevenson. I felt that Rick Stevenson and I were excellent candidates. I had two years of IRS experience, 15 years of supervisory experience and an advanced degree from a major university. Rick was a retired Lt. Colonel or Major in the U.S. Air Force with more than 20 years supervisory experience, he has a college degree, and two years of IRS experience. Susan Tufts, who ultimately got the job, had been a secretary for 17 years, had a high school diploma, and three years of IRS experience. I heard through the grapevine that the awarding on the position was held up pending a legal opinion by the Chief Division Counsel. It was rumored that among the issues was SSA Kim Jordan aggressively seeking inclusion on the career board that selected that position. It is my understanding that he normally would not have been on that selection panel. Tufts had previously been his secretary and they maintained a close personal relationship.

I took Tufts promotion in stride and continued to do my job with the same level of motivation. Almost immediately, there was underlying tension between us. She could not complain about my work as I was diligent in completing my assignments, writing and other work assignments. I felt she made it a habit of nitpicking at me. I was on very good terms with most of the agents and IRS's on squads 19 and 21. I gave them exceptional service and the agents often voiced their preference to work with me. Although this was unsolicited, each time it happened,

Tufts would become more agitated with me. I remember one particular occasion when the primary relief supervisor for a drug investigation asked if I would assistance in recovering a computer. As I had extensive experience working with computers, I agreed to assist him. A lead was subsequently assigned to me. When Tufts found out she became very angry. The Acting Supervisor on the Squad 21 had to call her in and remind her that she wasn't in charge. I subsequently completed that assignment successfully. I believe she took that personally.

I had been a volunteer fire fighter since I was 17. I had received training and had response experience in the area of dealing with hazardous materials. As such, I was encouraged to join the Baltimore Division's HAZMAT team. Although I had previously obtained training outside the FBI, it was mandated that I attend FBI HAZMAT training. Each time I was scheduled for training, Tufts was unhappy. It was my understanding that members of division management eventually had to make it clear to her that my participation in such training was required. I felt that her hard feelings toward me were persisting.

Sometime around the late spring of 2001, we were inspected. At the time, the inspectors took issue with two things. First, since the departure of SSA Martinez from the squad, the relationship between III and the National Center for Missing and Exploited Children had deteriorated. Secondly, the inspectors had heard from someone that one particular IRS who was in a night law school program, frequently did her law school homework during the day while on the books. I was called in by Tufts and SSA Penegor and basically accused of raising these issues with the inspectors since I sat next to the accused IRS. I had made no such statements to anyone of the inspection staff.

SSA Martinez had been transferred back to Baltimore headquarters city to oversee a Criminal Intelligence squad. He knew of the hardship the commute from my home in Newark, Delaware to Calverton, MD was placing on my family and suggested that I should consider coming up to headquarters city and working on some other program matters beside III. I told

him that I would be very interested in doing that. With his help, I was able to get a transfer to Squad 20, the Criminal Intelligence Squad.

By the time I finally transferred, SSA Jordan was supervisor for Squad 20. My immediate supervisor was SIRS Teresa Tamburrino. Initially, she didn't allow me to do very much and I was pretty much limited to looking up license tags, and running criminal histories and warrant checks in support of drug investigations. I wanted to get into meatier assignments but Tamburrino insisted on working with me. Her availability to me really limited the pace in which I was able to develop my skills. So I kept busy doing "grunt" work.

Tamburrino was not very effective at providing meaningful feedback. On one particular occasion, I had done some analytical work and returned it to her. I was told that it wasn't in the format normally used by most of the IRS's. Tamburrino came up to me and complained about the way I did the work. I asked her to bring it back and give me some guidance. She responded something to the effect " you f____d it up, it doesn't matter now."

Finally, several months after going to Squad 20, I was assigned to assist an agent from a White Collar Crime Squad and his Postal Inspector partner in providing some support for a "Boiler Room" investigation. The task basically required me to identify potential victims of the fraud activity by cross referencing information in multiple databases, linking up three different criteria. I attempted to seek guidance from our computer people and the contractor of the "Boiler Room" entity on how to accomplish this cross referencing. I learned that the databases weren't compatible so this couldn't be done as anticipated. Instead, I worked with the agent and Postal Inspector in going through more than one hundred boxes of documents. A second tasking relating to this case was to prepare a time line chart. I created the chart requested, giving a draft version on disk to the agent, which allowed him to take the disk down to the U.S. Attorney's office to review and amend in consult with the AUSA prosecuting the case. The AUSA had made several changes previously. Although the exact tasking could not be completed as set forth in the original lead, the agent expressed his satisfaction with the assistance that I rendered in that case.

Still, Tamburrino complained about my work in that matter. She contacted the agent and asked if he would write an EC documenting my poor performance. I understand she may have even offered to write it for him. The agent refused to do this. It is my understanding that upon reporting the conversation to his supervisor, the supervisor let it be known that no such EC or communication related to this matter was to be prepared without his approval.

Following the terrorist attack on 9/11/2001, I was deployed to the Pentagon as a member of the Baltimore HAZMAT team. I worked a night shift for approximately two weeks sifting through the rubble at the crime scene. During that assignment, I located the voice data recorder from the aircraft. When our responsibilities were completed at the Pentagon, I was sent to Dover Air Force base to assist members of the Evidence Response Team in the identification of the human remains and retrieval of evidence. My EMT and fire fighting experience made me well-suited for this assignment. We spent approximately 3 weeks at Dover. Periodically during the course of these "Penttbomb" deployments, I would contact Tamburrino and I felt she was upset that I wasn't in the office doing what the other IRS's were assigned to. While I was away, she assigned me a lead to serve subpoenas in a bank robbery investigation. To my knowledge other IRS's were not being assigned non-terrorist related leads. While I was in the middle of stressful HAZMAT team duties, Tamburrino nagged me about the subpoenas. To my knowledge, the case agent himself had been diverted to address counter- terrorism leads and was not actively working on the bank robbery investigation. I finally had to go to SSA John Sylvester, the HAZMAT coordinator and SA Bridgit Bingham, the ERT leader, to intervene with SSA Jordan on my behalf. It seemed that I was contacting SSA Sylvester on a weekly basis about this matter.

We concluded our work at Dover AFB and returned to Baltimore. However, I was still directed to perform HAZMAT related duties and did not return to my routine IRS duties. It was about this time that the anthrax was discovered at a number of locations around the U.S. I

was going on "powder runs" for most of the next several weeks. Finally, when the anthrax was discovered at the NBC Studios in New York, I was one of four Baltimore HAZMAT team members sent up there to respond.

Although we found positive responses in our samples for "weaponized" anthrax, we staged in the "hot zone" without proper protective equipment. It was the belief of FBIHQ that this was acceptable at this time. We were instructed to suit up inside the building. We were told that they didn't want the news media to film us in protective gear. I equate that with putting on your ballistic vest after you're through the door in an armed confrontation. The real problem began when one of the team members became symptomatic. We were directed to proceed to a location where the four of us could be airlifted to Johns Hopkins Medical Center for treatment. Enroute, we were involved in an automobile accident and the symptomatic female agent received minor injuries requiring hospitalization. The four of us were subsequently driven to Johns Hopkins the next day, provided antibiotics and sent home for four days.

When I returned to the office I and several other members of the HAZMAT were invited to participate in a forensics training session in Rockville, MD. The group putting on this class worked with us extensively at Dover AFB. As a result of the HAZMAT assignments relating to PENTTBOMB and anthrax case, I was away from my assigned duties until roughly Mid November 2001. Tamburrino assigned me to work full-time in the Baltimore Division command post. Due to that assignment, I could not leave the CP to do my regular work or respond to HAZMAT runs. Nevertheless, Tamburrino continued to ride me about the not completing my assignments. I finally was fed up with her pettiness and took my case to AO Chuck Mossbach. Mossbach responded to me that he had discussed the matter with SSA Jordan and he would not do anything because SSA Jordan had a problem with my work performance.

I was subsequently called into SSA Jordan's office for a counseling session. I was told that my failure to appropriately address the "Boiler Room" investigation and bank robbery investigation assignments, my extensive involvement in the HAZMAT team deployments, and my

failure to scan pictures into an agent's investigative file, prompted the counseling session. I was also chastised for "going over SSA Jordan's head" in complaining to AO Mossbach about Tamburrino. I had assumed since both Tamburrino and I were support employees, that Mossbach was the proper person with whom to direct my grievance. Jordan told me he was "going to the mat" over this. Another complaint SSA Jordan had was that I put my feet up on my desk and talk on the phone. I explained to him that the phone calls were work related, often liaison contacts, and that I occasionally put my leg up to relieve discomfort from an earlier knee injury and broken ankle. As a result of the counseling session, my authority to work a "flex" schedule was rescinded, I was removed from the HAZMAT team, and I was placed on daily reports.

Following that counseling I was assigned to help clean out the backlog of "rapid start" leads. This was said to be the highest priority in the office. I was working full time on this project, yet Tamburrino continued to ride me about the bank robbery assignment. Again, at this time, I believe the agent assigned that case was working full-time on terrorism matters himself. Eventually, I was able to address the bank robbery case and several long term assignments on a domestic terrorism case and to a FISA. When I returned from Dover, I found that the bank robbery subpoenas that Tamburrino had been nagging me about had been sent. However, the data was not complete. Therefore, I had to have some subpoenas re-issued.

Most of my time was taken up servicing the FISA. It was made clear to me that this was my number one priority. My FISA-related duties included preparing weekly reports, filing digital dialing printouts, and reviewing English language conversations. There were sometimes as many as 100 calls per day intercepted, about half of those in English, so this assignment kept me very busy. At one point, I was told that the case agents had complained about my work. Tamburrino told me not to review calls any more. In my discussions with case agents Brad Lynch and Paolo Castro, they acknowledged that SSA Jordan had called them in to talk but that they told me they never complained about my work. Within days, Castro was reassigned from the case and I was again instructed to review the calls.

At some point, SIRS Tamburrino told me to stop working on the white supremacist matter as she considered the investigation to be unlawful. SA Neally heard this and he and SSA Jordan had a discussion. I documented SIRS instructions to me to cease work on that case in an EC to the file. Again, this further upset Tamburrino and SSA Jordan.

Around this time, the division advertised three GS-12 IRS positions for the Joint Terrorism Task Force (JTTF). I was interested in this positions so I inquired about putting in for it. I was told by a person involved in the career board selection process after the career board met that I was not considered because of my attitude. At that point I believed that I had been unfairly treated and my reputation harmed by SSA Jordan and Tamburrino, so I filed an EEO complaint against them. The IRS's selected for the GS-12 positions were not the most impressive candidates, a further example of the manipulation of the career board system in Baltimore.

Shortly after, on the Tuesday after Memorial Day 2002, SSA Jordan gave me a 90 day "Warning PAR". The language on that PAR was almost identical to the counseling session that I received. I disagreed with the PAR and refused to sign it. I was threatened with being further charged with insubordination so I initialed the report. This meeting took place in ASAC Kevin Lewis' office.

On or about 5/24/2002, I received a voicemail message from an agent in the office that SSA Jordan, SSA Mike Ross, and another agent working on a drug squad were "bagging" my desk. I suspected that SSA Jordan was attempting to locate information concerning my EEO complaint. Following that report, I began taking all materials relating to the EEO complaint with me each evening when I left the office. I believe I took a tray containing my computer disks home with me around this time and left it there.

On 5/30/2002, I had just left the office when SA Larry Foust, the Baltimore Division's Security Officer, stopped me and asked me to accompany him to ASAC Kevin Lewis' office. ASAC Lewis asked me for permission to search my bags and later my vehicle. I

consented. In my backpack were the file review sheets, daily reports including the ECs, criminal histories and DMV checks relating to a white supremacist group and other communications submitted as attachments to the daily reports, the Warning PAR, previous performance appraisals, etc. I believe most of these items were relevant to the EEO complaint and/or part of my response to the Warning PAR. I don't believe that anything of significance was found in my car. I also had with me, various training materials, some of which was considered law enforcement sensitive. This related to HAZMAT, white supremacist groups, or international terrorism. I don't believe that any of that material was classified. However, on that date, I was late for an appointment and had spilled a can of soda on my desk while packing up. It is possible that I might have been distracted by this and picked up documents that I didn't intend to include. I am normally very conscious of security matters, particularly as it relates to classified material. I frequently sought guidance from Louis Bernstein who is very knowledgeable about FISAs, and on at least one occasion with security officer Larry Foust about classified documents and training tapes. An example of my commitment to safeguarding classified materials was my locking a door in the FISA monitoring area. It turned out that no one who worked in that area knew where to locate the key and it was not routinely locked.

I attempted to be as cooperative as possible with ASAC Lewis and SA Foust. It wasn't until the request was made to go into my home that I posed any objection. At this time I was informed that all my previous consent was considered voluntary. I have young children and my wife does not need the stress of having FBI agents rummaging through our belongings. For that reason, I did not give consent to search my home. Prior to this time, I was not overly concerned since ASAC Lewis stated he did not know what they were looking for. However, when the agents came and requested consent to search my home I requested they obtain a search warrant. Thereafter I cooperated fully, and even intervened when my attorney started acting like a jerk to the agents, some of whom I consider my friends. Since that time I have been on administrative leave and have not been back to the office.

During the search of my residence, I am aware that computer media was seized which contained documents relating to my EEO complaint and a response to my warning PAR. Also found were various PowerPoint presentations relating to my assignments in the III and the HAZMAT team. I removed the tray containing my diskettes from the office after it was reported that SSA Jordan and others were "bagging" my desk. I did not want him to remove any items relating to my EEO complaint or to see my response to his warning PAR. I did not specifically intend to take any of the media containing the training materials but simply made the mistake of not taking them out of the tray when packing up for the day.

All of the III images found in my home were contained on two zip disks, and were slides in PowerPoint presentations given at training sessions by myself or others involved in the III. The specific III presentations that I was involved in were to the New Castle Delaware Police Department, the Delaware Police Academy, the Georgia Police Chiefs' Association, and the Georgia Chapter of the FBI National Academy Associates. I maintained those presentations, as well as similar presentations for HAZMAT matters, for future training that I might do, and not for the viewing pleasure of myself or anyone else for that matter. FBI personnel from other divisions continued to call me for assistance since the new IRS's assigned to them was not aggressive nor did they follow up on a timely basis according to them. No images in my possession were ever transferred, displayed or printed other than for legitimate FBI official business reasons. I do not own a computer capable of viewing zip disks.

With regard to taking work home with me, I have a strong work ethic and am committed to being responsive to the investigators whom I work with. Many other FBI IRS's don't have that level of commitment. Starting when I was at III, I took my responsibilities very seriously. At the time there was the requirement for other divisions to coordinate with Baltimore prior to opening an innocent images investigation. The deadline was very short and the need to provide those divisions a rapid response was also great. I frequently took an III laptop home to do those ECs. That practice was approved by both SSA Martinez and SSA Penegor. On occasions where I was going to training, I would have likely taken a laptop containing the