PowerPoint presentation as well as the projector home with me so that I could avoid a stop at the office on my way out of town.   On one occasion I attempted to get a laptop to take some undercover accounting work home with me.  SSA Penegor instructed me not to do that and I fully complied.  On another occasion, I wanted to do some work creating a database relating to a domestic terrorism case assigned to me.  Tamburrino found out about my request and told me I could not take a computer.  Again, I complied fully with those instructions.  It was my understanding that I was complying with established procedure.

I don't recall having received specific instructions from any of my supervisors, either SSAs or IRS's, about any general policies that exist relating to taking work home.  It is common practice for agents to do that, although it is generally not done by IRS's.  Occasionally, Susan Tufts would make off-handed remarks about my taking work home with me.  I did not view this as her questioning me regarding the content of the material.  I believed that she was implying that when the work day was done, you should leave you work responsibilities at the office.  Again, I feel I have a higher level of commitment to the job than most IRS's so I was not deterred from this practice.

I did not have the habit of taking sensitive or classified investigative matters from the office to my home.  I did take training materials, such as HAZMAT, ERT, middle eastern culture, etc, that I received at conferences or as distributions to FBI employees, home with me to read.  However, these were not classified.  On one occasion, I took a document title the Al Queda manual home for review.  When I got it home I noticed it was written in small print that the document was not to leave FBI space.  I kept it with me the entire time for fear of losing it, until I was able to return it to the office.  I had previously obtained the exact same document by downloading it from the DOJ internet site.  I also had the habit of completely cleaning off and locking my desk each night.  Again, any materials which were found in my possession outside the office I strongly believe were directly related to my EEO complaint, and/or the response or an intended response to the Warning PAR issued to me.

The specific instructions the I remember receiving concerning security matters or the handling of classified documents were as follows: 1) SA Danny Lee (retired) gave me a 45 minute security briefing approximately 3 weeks after my EOD. I don't recollect any specific instruction about security issues; 2) At the "Back to Basics" conference, we were given a presentation about security issues. We were also told to expect spot checks of our desks. As my desk was at a high traffic location, I had the habit of cleaning it off each night. I began that practice at MMOC when I wanted to make sure any offensive child pornography was put away each night as there were cleaning people and visitors in the space regularly; 3) I periodically received EC via email which discussed policies concerning classified materials. This way especially true after the 9/11 incidents.

I had requested locks for my storage areas and desk in an effort to better safeguard materials I was working on. That request was denied.

When I left III and transferred to Squad 20, I was given an exit briefing by Susan Tufts. Among the questions that she asked me was if I had any III investigative material in my possession. I responded that I had no investigative material in my possession. At the time there were two computer disks charged out to me. However, it was my belief that those disks had been return to the case agent Alexis Vlahos. I contacted him and he acknowledged that those were probably under his desk. I also contacted the evidence technician Daryl Henry to further ensure compliance. I never heard about it again so I assumed those were found. The III training materials that I maintained after leaving MMOC were created by me or other personnel involved in III. Any images came from the "shared" drive. I did not consider those to be investigative materials so I believe my response to SIRS Tufts was truthful.

I have no other pertinent information regarding the aforementioned allegation. I have been advised that I may and should submit any additional information of which I may become aware regarding this inquiry, to the FBI's Office of Professional Responsibility (OPR).

I will take a voluntary polygraph examination concerning the truthfulness of the information contained in this signed, sworn statement.

I have been instructed not to discuss this matter with anyone other than the persons conducting this interview, FBIHQ representatives from OPR, the Ombudsman's office, and/or FBI Employee Assistance Program (EAP) Counselor, or my attorney. I have been told that should I decide to discuss this matter with anyone else, I must first obtain authorization from the interviewers.

I have read this statement, consisting of this and thirteen (13) other pages, and it is true and correct to the best of my knowledge.

_____

James N. Patnaude

Sworn and subscribed before me on the 26th day of June, 2003, in the city of Wilmington, Delaware.

_____

John J. Blake
Supervisory Special Agent

Witness:

_____

Marcus M. Williams
Supervisory Special Agent

# EXHIBIT 5



**U.S. Department of Justice**

Federal Bureau of Investigation

_Washington, D.C. 20535_

April 5, 2004

PERSONAL

Mr. James N. Patnaude
Federal Bureau of Investigation
Baltimore, Maryland

Dear Mr. Patnaude:

I have completed my review of an administrative inquiry regarding allegations you violated security procedures by removing FBI investigative files from FBI working space and intentionally disclosed information from FBI investigative files to unauthorized individuals.

I find insufficient evidence to substantiate the unauthorized disclosure allegation and, therefore, will not discuss it further. However, I find sufficient evidence to substantiate the security procedure charge. Consequently, I find your conduct warrants a suspension of five calendar days.

According to the record, you filed a grievance with your Equal Employment Opportunity (EEO) counselor in April of 2002, in response to what you perceived as unfair treatment by Support Supervisor #1 and Agent Supervisor #1, your direct supervisors. In your Signed, Sworn, Statement (SSS), dated June 26, 2003, you indicated you "began taking all materials relating to the EEO complaint with [you] each evening when [you] left the office" after you were notified that two Baltimore Division managers "bagged" your desk on May 24, 2002. You assumed they were searching your work area to locate information regarding your EEO complaint or your response to the Warning PAR you were about to be issued. The Warning PAR was approved by

Mr. James N. Patnaude

your rating and reviewing officials on May 21, 2002, and presented to you on May 28, 2002. You also indicated you "took a tray containing [your] computer disks home with [you] around this time and left it there."

On May 30, 2002, you were stopped as you were leaving the Baltimore office and asked to consent to a search of your personal belongings and your vehicle. You granted consent. According to the October 2, 2003, Electronic Communication (EC) to Baltimore and the Office of Professional Responsibility (OPR), you were in possession of the following: fifty-three (53) documents designated "Secret;" eleven (11) documents designated "Sensitive and Secret;" six (6) documents designated "Sensitive;" three (3) documents designated "Law Enforcement Sensitive;" and ninety-eight (98) documents that were determined to be neither "Secret" nor "Sensitive."

According to your SSS, you were carrying the following items in your backpack: "[Case] file review sheets, daily [performance] reports including the ECs, criminal histories and [Department of Motor Vehicle] checks relating to a white supremacist group and other communications submitted as attachments to the daily reports, the Warning PAR, previous performance appraisals, etc." You indicated your belief that all of these items were "relevant to the EEO complaint and/or part of [your] response to the Warning PAR." The results of this investigation could not refute this assertion as no materials were located in your possession that did not bear a direct relationship with your official work duties. You also admitted you had in your possession "training materials," which related to "HAZMAT, white supremacist groups, or international terrorism." You expressed your belief that none of this material was classified. Indeed, subsequent review of the training materials determined that they were not classified, although some of the materials were found to be "Law Enforcement Sensitive."

On May 31, 2002, a criminal search warrant was issued to conduct a search of your private residence for additional evidence of any classified documents. This search resulted in the recovery of two "zip" diskettes, which, upon technical analysis, were found to contain thirty-six (36) image files which related to documents designated as "Secret." These images were affiliated with your prior assignment to the Innocent Images National Initiative. You explained that you were not aware that you were in possession of these diskettes as you had made inquiries indicating the disks were in the possession of the former Case Agent who handled that matter. You explained you inadvertently removed them to your residence when you brought home your tray of EEO-related diskettes. Additionally, you indicated the diskettes were formerly used for training purposes and that you did not have the capability to view the image files as your home

Mr. James N. Patnaude

computer was not capable of reading "zipped" files. Finally, you attested that "[n]o images in [your] possession were ever transferred, displayed or printed other than for legitimate FBI official business reasons." No evidence to the contrary was presented in the record.

In light of your admissions, I find you violated the following provisions of FBI policy regarding the proper security measures for handling classified information:

The Manual of Investigative Operations and Guidelines (MIOG), Part II, § 26-5.3 (1), entitled, "Removal of Classified Material to Residence" (emphasis added):

> Employees may not remove classified material from official premises to their residence during nonworking hours without approval from the Director, the FBIHQ Security Programs Manager (SPM), *the SAC for FBI field offices*, or the appropriate Assistant Director at FBIHQ. In every instance of approval, the material removed must remain in the personal control of the authorized employee at all times unless a safe and an alarm are installed in the residence by the FBI. Before installing any such equipment in a residence, the SPM at FBIHQ should be contacted for guidance.

The MIOG, Part II, § 35-9.1.1 (2):

> Classified or sensitive FBI information must be processed, stored, or transmitted in spaces which are under exclusive FBI control while operational. When not in operation or under the direct personal control of an authorized person, FBI [Automated Data Processing and Telecommunications] systems and information must be protected by storage areas, storage equipment, and/or systems or measures which are consistent with the FBI's facility security program.

Mr. James N. Patnaude

The Manual of Administrative Operations and Procedures, Part I, § 1-3 (2), provides the following:

> All government and FBI records, to include computer records, are to be used solely for official purposes. The use of FBI records, or records made available to the FBI through other government agencies, for the purpose of obtaining information for personal use is strictly prohibited.

The FBI Employee Handbook, at page 35, provides the following:

> You may not remove records, either during or after your tenure of service with the Bureau, nor discuss orally, in writing, or otherwise, with any unauthorized person, any information you obtain in your official capacity as a Bureau employee. . . . Information learned as a result of FBI employment is not to be used or published freely. . . . Any violation of this confidence will be regarded as a serious breach of trust.

While I note the credibility of your justification for removing the classified materials, it does not excuse your disregard of FBI policy regarding proper removal of such items from the field office. FBI policy is clear that in order to remove classified materials from the work space, an authorized individual must have the approval of the Special Agent in Charge. Even if you had obtained such approval, and the material had been deemed "non-operational," it should have been properly stored to prevent disclosure. Your practice of using boxes, backpacks, duffel bags, and your personal vehicle were inadequate means to secure classified materials when away from official FBI work space. Finally, you should have been aware that FBI records are not permitted to be used for "personal" reasons, such as protection of your EEO grievance. Arguably, however, your justification regarding your preparation of a written response to the Warning PAR, an item which was required under the terms and conditions of the document, was official in nature. Nonetheless, you should have sought approval for the use of the documents, particularly since you were removing them from FBI work space.

Mr. James N. Patnaude

Based on this information, I find preponderant evidence that you failed to properly secure classified information by removing it from FBI work space without proper authorization.

After my review of the relevant disciplinary precedent and my consideration of the aggravating and mitigating factors in your case, I find your actions warrant a suspension of five calendar days.

The FBI must hold employees accountable for violations of its standards of conduct, rules, regulations and policies. Progressive discipline is applied, where appropriate. This disciplinary penalty is intended to convey the seriousness with which the FBI views your actions. You can expect to receive a more severe disciplinary penalty in the future for a similar disciplinary offense.

## APPEAL RIGHTS

Should you desire to appeal this action, you may address your written response stating the grounds on which you base your appeal to the Assistant Director (AD), Administrative Services Division (ASD), Room 6012, U. S. Department of Justice, Federal Bureau of Investigation, J. Edgar Hoover Building, 935 Pennsylvania Avenue, Northwest, Washington, D.C. 20535-0001. Any appeal must be filed within ten calendar days following notification of the disciplinary action. **Your division head must be notified at the time you file an appeal. If an appeal is filed, the OPR disciplinary penalty will be held in abeyance pending the appellate decision.**

Upon receipt of an appeal of a suspension of fourteen calendar days or less or a probation action, the AD or Deputy AD, ASD, will personally review and decide the appeal. Upon receipt of an appeal of a suspension more than fourteen calendar days, dismissal, or demotion, the AD, ASD, will establish a Disciplinary Review Board (DRB) to review the action taken by the OPR. In exercising appellate authority, ASD and a DRB may independently redetermine the factual findings and/or the penalty imposed. Should you wish to employ an attorney to assist you in this appeal, you must ensure that the enclosed forms on the disclosure of FBI information be completed prior to any disclosure of Bureau information to the attorney handling your appeal. If you and the attorney who will assist you on appeal have earlier completed and provided these forms to the Bureau in connection with this case, these forms do not need to be reaccomplished. You are referred to the Director=s Memorandum to all Special Agents in Charge, dated March 5, 1997, for additional details pertaining to appeals.

Mr. James N. Patnaude

## <u>REFERRAL TO OTHER DIVISIONS</u>

In accordance with established policy, the results of this communication will be shared with other divisions as appropriate.  This administrative inquiry is being provided to the Security Division as it may be relevant to an employee's retention of a Top Secret security clearance.

Sincerely yours,

*Mary Rook*

Mary Rook
Chief, Adjudication Unit II
Office of Professional Responsibility

Enclosures

**EXHIBIT 6**

**Guideline E – Personal Conduct**

In response to the acquisition that on May 30, 2002 I was observed on Closed Circuit Television ( CCTV)  removing documents in my backpack,  I stated in my interview with representatives from the Office of Professional Responsibility ( OPR ) that I was removing documents that I thought applied to an Equal Employment Opportunity (EEO) complaint that I had filed in April, 2002. I have received a voice mail message from SA Steve Gordon, who I had worked with on the Innocent Images Initiative, that it appeared to him that my desk was being "bagged" by one of the supervisors I had filed a complaint against as well as another SSA.  I routinely checked my messages over the weekend and had reviewed this message over the Memorial Day weekend.  Upon my return to work the following Tuesday I was immediately given a 90 day warning Performance Appraisal  Review (PAR) by the same SSA who I believe had bagged my desk in ASAC Lewis's office. Because I felt that this action was retaliation for my EEO complaint I remained in the ASAC's office and informed him that I thought that this was a retaliatory action and informed him of my belief that my desk had been searched. He instructed me to make a list of anything I thought was missing. At the time I felt that he took this acquisition rather lightly. It now is apparent to me that this is when that CCTV was installed. Thinking that the SSA had bagged my desk and that the ASAC didn't see this as a problem I removed any documents related to my EEO complaint when I went home at night. I am not sure if I informed the ASAC of this intention at that time, unfortunately it has been almost twenty three months since the event. I readily related this information to the OPR investigators and reiterated this information again when an OPR SSA wanted to clarify some of my initial statements before forwarding my package to adjudication.

I also stated at this time that I took my daily work reports home in an attempt to formulate a response to the warning PAR since I still had to complete all work date sensitive work related to a wire I was assigned to. I believe the statements I gave have been provided to Mr. Phalen's office and these statements are contained therein for you to verify should you so desire. You will also see in these statements that I accepted responsibility for unintentionally related the classified material noted in Mr. Phalen's letter dated March 18, 2004. My intent was not to remove ANY restricted materials but rather to be able to respond to the PAR and protect the contents of my EEO complaint. There has not been a day go by since this event that I have not deeply regretted my mistake and I am truly sorry for the trouble it has caused not only myself but the Bureau. A review of the information will show that every document relates to case work that was either part of my PAR or EEO complaint or both.

In the past I was more then willing to go the extra mile to complete my assignments and to support investigations. I routinely brought non-classified material home to read, sort, etc. so as not to waste time on the more mundane tasks during the workday. This included material related to HAZMAT topics, background on the fundamentalists that we are now faced with, etc. Once the SIRS from the squad I was assigned asked what I was taking home, I indicated that it was HAZMAT related and asked her if she wanted to examine my bag and she declined. This is the only time I remember her making any inquiry as to

what I was doing at home. You will also note that I requested to take a Bureau PC home to complete some work at home. The Computer Specialists in charge of Baltimore PC's readily gave me a PC. This appeared to be a common practice although there didn't appear to be too many people willing to do extra work. The SIRS informed me that I could not bring the computer home, so I returned it and did not work on the project. Because of the time that has elapsed since this event I have no recollection as to what I was going to work on.

Other material that was removed on May 30, 2002 related to a Domestic Terrorism case and I was planning on sorting through information the case agent had provided me that he had received from the Pennsylvania State Police and from other sources, including me. I have attached a copy of an Electronic Communication (EC) related to this case, that I was allowed to retain, that indicated that the SIRS felt that this was not a legal investigation, even though it had been reviewed and approved by division counsel and FBIHQ. I was attempting to bring the agents information up to date as soon as possible since this disagreement and therefore my availability to work on the case was sporadic at best.

In regards to the material that related to Innocent Images investigations, anything I had to the best of my knowledge was training materials that I had developed while assigned to that unit. When I left the unit the SIRS asked if I had any case related documentation to which I truthfully responded no. I was not aware that I was in possession of any case related material until receipt of Mr. Phalen's letter. My review sheets indicated that I had two CD's related to an Innocent Images case. I diligently reviewed all CD's in my possession and verified that I did not have any such CD's. I contacted the Evidence Tech, Daryl Henry, Baltimore Division office, on at least two occasions and a search for the material was conducted and was negative. I then contacted the Case Agent, whom I believe was SA Alexis Vlahos, Maryland Metropolitan Office Calverton (MMOC), and he was of the opinion that I had returned all investigative related material to him and that he probably had it under his desk. I thought the matter was resolved at that point. I was told from day one to back up everything I put into the FBI computer system because it was antiquated and over worked. I did this religiously and I am sure my disk tray has a disk with a copy of the very first EC I did in it somewhere. I did not look in the disk tray because I was under the impression that the material was on CD medium. I had taken the tray home because it contained copies of all the documents I had submitted to EEO and as stated above, I acted to protect the contents of my complaint.

I did not consider the training material from Innocent Images to be case related and it was common practice for people leaving the squad to keep there training materials. I had developed a very good relationship with the divisions I had worked with in Innocent Images as well as other divisions who were assigned IRS's who were less responsive then myself. I developed a reputation of the person to call if you had to get something done on a timely basis. The people from these divisions continued to contact me after I was reassigned and I gladly provided copies of training materials for there use in the absence of any response from the IRS currently assigned to them. A lot of good will can be generated by taking ten minutes to provide someone with material that you have already

developed. I will gladly provide a list of people you can contact within the Bureau that will verify that I continued to assist them when I could after my reassignment.

The medium that the training materials were on were ZIP disks. I hope during the examination of this material it was noted that it had been quite some time since the files were open. In addition, when I was reassigned, I was provided with the PC I had while assigned to Innocent Images with contained a ZIP drive. During the first phase of Trilogy I was given a new PC that did not have a ZIP drive. In addition, you can see from the documentation that the personal PC and my wife's portable PC did not have ZIP drives nor did they have the software to accept peripheral external drives of this nature.

Initially I was threatened by an AUSA from the Baltimore Office to resign or he would charge me with whatever he felt appropriate, which included possession of Child Pornography. Through the attorney I had at the time, on March 14, 2003 I responded that I would resign if he wrote the resignation, otherwise go ahead and charge me. My attorney and I never heard from this AUSA again and I was informed that a declination was prepared by the Baltimore U.S. Attorneys office. My next contact was with the two SSA's from OPR in June, 2003. It was made clear that there was no longer the threat or belief that I had done anything of a criminal nature related to child pornography and that the investigation was now administrative.

In addition, I contacted two of the previous Innocent Images Program Managers, Jorge Martinez and Jack Boyle, and inquired if there was a policy about retention of Innocent Images training materials. Both individuals indicated that there was no such policy and I would imagine if you contacted other prior members of the Innocent Images squads who taught, they also have retained their training materials.

The statement that the SIRS from Innocent Images admonished me is also subject to question. She considered me a threat because of my education, experience and work ethic. She indicated just as much to the first supervisor I worked for, Jorge Martinez, and I believe also to the second, Jan Penegor. She is also a close personal friend of the SSA that I filed the EEO complaint against. Again, I am trying to recall discussions, from as far as three years ago, but the only time I was told not to work on something at home was by SSA Penegor. Financial records that were supposed to be completed by an SA assigned to the Squad were behind and were subject to late fees, interest, etc. These fees caused great problems for the operation and because I am a Certified Public Accountant (CPA) I volunteered to assist. SSA Penegor said not to do this work at home so I did not. There was no big issue or discussion and because I was still able to straighten out the accounting issues I was given an Award of two vacation days by SSA Penegor.

In response to the accusation that I accessed files in ACS and IIIA that were not assigned to me I can easily explain this. As I mentioned before, if an agent needed someone checked out in a hurry or had waited an extended period of time for another IRS to respond to a request, I would take the time, usually no more then fifteen minutes, to look up the data. I didn't make a big fuss about stopping for a few minutes to assist someone and felt that I was just being a team player.  I probably did not generate a file

insert every time I did this because it was not a major undertaking. In addition, a common tool in any type of research, be it criminal, financial, etc., is "data mining" or "drilling down." To look up a subject and not try to cross reference useful information to other subjects, dates, activities, etc. is just plan lazy. I am sure I am not telling you anything you don't already know that by trying to link even seemingly insignificant details sometimes you produce something useful. I would always try to find a way to find additional information or links to be thorough and to be sure that I wasn't letting something slip by. For example, one agent asked me to run routine checks on three individuals. By digging a little deeper then just running the names I found out that they all had the same date of birth. This date of birth happen to be the day that the United Nations recognized Israel as a separate country. While this ultimately turned out to be a none event, I did the additional work to make sure that there was not something underlying that might have been missed.

On page three of Mr. Phalens letter it indicated that the search of my automobile yielded other material that had been removed from the office. This is not true. I was not provided with a list of any material that was retained that evening, but I am sure that nothing was removed from my car. My trunk was full of emergency medical supplies and extrication equipment related to my participation with the volunteer fire department in my home town. Since I have no other way of refuting this I can only hope that the tapes exterior security cameras were retained to verify my claim.

In addition, on the same page it states that I had been removing documents for months. This is also untrue. As I previously stated I was not averse to going the extra mile to perform my duties. I also took security very seriously. When I was originally assigned to a wire I set all the alarms and locked the door to the room at the end of the day. The next morning I was ribbed continuously for locking the door because no one ever did and they couldn't find the key to unlock the door. I had asked for locks to be installed in my work place to secure materials at not and was told that it wasn't necessary. I had borrowed tapes from the language unit at FBIHQ, and even though these tapes can be purchased at Borders, I requested permission, via e-mail from the security officer to remove the material from the building.

In response to the acquisitions that I had encryption software, steganography  software, wiping programs and material from the FBI Information Technology System on my computer I strongly disagree with this claim. When my PC was returned it was inoperable because the hard drive had been damaged. I forwarded the entire system to a law enforcement officer that I know who is the Director of Certification for the International Association of Computer Forensic Examiners. I believe this is the same body that certifies FBI CART examiners. At the very least he indicated that the hard drive had been effectively damaged enough to prevent me from disproving any allegations as to what was on my hard drive. This being said, the hard drive has been forwarded to a company that specializes in retrieving data from drives in this condition. This individual is also a member of several boards and organizations related to forensic computer exams and performs work for the FBI on occasion. Hopefully, this exam will be completed within the next few days. I will gladly provide you with the results of this

work but have been advised to forward the results to the DOJ Office of the Inspector General and DOJ Office of Professional Responsibility first.

I have researched steganography and encryption on several occasions because both technologies apply to child pornography violations and terrorism. To the best of my recollection I never did any of this research on my personal PC because I have two young daughters at home and I am extremely cautious about what could wind up on my PC. I believe that all my research was done on FBI computers that were earmarked for this type of work and that I was allowed to access. I have been out on Administrative Leave, both paid and now unpaid for just under twenty-three months. I am not sure what the FBI Information Technology System refers to but I would not put FBI documents on my personnel PC. This item will hopefully also be addressed with the results of the forensic computer exam.

**EXHIBIT 7**



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D. C. 20535-0001

July 15, 2004

Mr. James N. Patnaude
9 Withams Road
Newark, Delaware 19711

Dear Mr. Patnaude:

        This letter is to acknowledge receipt of your
letters dated March 29, 2004 and April 21, 2004 requesting
reconsideration of the revocation of your "Top Secret"
security clearance.  This letter is to also acknowledge
receipt of your letter, dated July 9, 2004.  While you did not
request the documents upon which the revocation was based, I
have taken the liberty of providing you with those documents.
In addition, I am also enclosing copies of the Adjudicative
Guidelines used to assist in determining eligibility for
access to classified information and a copy of Executive
Orders 10450 and 12968.

        I have reviewed all of the information available
including the information you provided in your three letters.
As a point of clarification, I note that the sensitive FBI
material recovered from your residence was on removable
magnetic media, not on a computer hard drive, as previously
communicated.  Nonetheless, I have concluded that sufficient
basis exists to uphold the revocation of your "Top Secret"
security clearance.

Mr. James N. Patnuade

You have the right to appeal this determination to the Justice Department's Access Review Committee (ARC) within 30 days upon the receipt of this letter. The appeal should be addressed to: Chair, Department of Justice ARC, Room 1112 Main Justice Building, 950 Pennsylvania Avenue, N.W., Washington, D.C. 20530-0001. A copy of your appeal to the Department must be directed to me at FBIHQ, Security Division, Room 7128, 935 Pennsylvania Avenue, N.W., Washington, D.C. 20535. Your appeal must be in writing, and must contain the following information:

* Your full name, address and telephone number(s);

* The name, address and telephone number of your attorney or other representative, if any;

* Any written statement, relevant documents, materials, or information that you wish the ARC to consider. Classified National Security Information involved in the appeal process must be protected in accordance with the provisions of 28 CFR, Part 17. Access to this information may only be granted pursuant to the requirements set forth in Executive Order 12968, "Access to Classified Information."

* A statement whether you wish to appear personally before the ARC.

An appeal filed outside the 30 day time period will not be accepted by the ARC, unless you demonstrate compelling reasons beyond your control which prevented timely filing.

Should you require any additional information, or have questions concerning this matter, please contact Allen L. Hirsch, Unit Chief, Reinvestigation Unit, (202) 324-4905.

Sincerely,

Charles S. Phalen, Jr.
Security Programs Manager

Enclosures

# EXHIBIT 8

9 Withams Road
Newark, DE 19711
July 22, 2004

Mr. Al Hirsch
Unit Chief
Security Division
Federal Bureau of Investigation Headquarters
935 Pennsylvania Avenue, NW
Washington, DC 20535

Dear Mr. Hirsch,

I received the Excised Copy of my Security Clearance Revocation on Friday, July 16, 2004 and after a cursory review noticed the following items were either missing or not fully explained to be of any use.

The items missing or requiring additional explanation are as follows:

1) The is no copy of the Closed Circuit Television tape that shows I was observed placing documents in my backpack.

2) There was nothing removed from my personal vehicle. Since there was no documentation or photos taken of the search of my vehicle, I request a copy of the exterior security camera of the parking lot. I'm sure based on the seriousness of the charges that this tape would have been retained.

3) There is a reference in one of the Electronic Communications that stated that SIRS Tufts drafted a memo regarding the nature and contents of her alleged exit interview. While the presence of this communication in Tuft's desk is convenient for the investigating SA's, I would like to know if anyone verified the actual date of its generation by reviewing the disk or file that it was stored on. The OPR investigators specifically mentioned that they were not sure if such a memo existed. Also, was Tufts's statement given under oath?

4) None of the Personal Appraisal Reviews (PAR's) that were prepared by Tuft's were returned to me the night my belongings were searched. I would like to review these because there were never any negative comments in the reviews she prepared and that I had possession of up until May 30, 2002.

5) The audits of the ACS system and the NCIC system yielded numerous names I am sure. The file folder that contains the documents I would have generated to

document these queries were not returned to me. These documents would explain many of the queries that are being presented as "unusual." I would also like a copy of the NCIC relief schedule for the period in question because this would also allow me to explain many of the queries since normally documentation is not generated for queries made while on relief. Lastly please have the appropriate party contact me because there are several SA's I would like interviewed that will substantiate the fact that I would run checks for them as soon as they asked, rather then waiting for hours up to days for someone else to run them.

6) The file I was sent contains absolutely no information related to the 305 investigation that was suppose to have been conducted. Is this information forthcoming?

7) I would like a list of the names of the supervisors and peers that were interviewed and the corresponding FD 302's, concerning my case. I believe there were ten (10) subjects interviewed. As you are well aware it is easier to find what you are told to look for then to find the truth if the pool of potential interviewee's is narrow.

8) There are several inconsistencies that I noted in the file as to the time line of events and information that was provided; I will address these issues in my response to DOJ.

9) I would like to know the author or person who provided the data, if they are not the same, for the letter from Mr. Charles S. Phalen, Jr., dated March 18, 2004. My reason for asking is that the contents and writing style bare a strong resemblance to that of a supervisor in the Baltimore Division that I have an outstanding EEO complaint against. The EEO Unit had added retaliation charges to my original complaint and this would have bearing not only on that but also on my response to the DOJ ARC. I have provided a copy for your reference.

10) Have the original copies of the results of my pre-employment polygraph test and/or the documentation related to my overseas travel prior to my FBI employment been located?

11) I plan to request a personal appearance before the ARC as soon as possible. I anticipate have my response, excluding the above requested items, completed and forwarded to the ARC no later then July 28, 2004.

Obviously, as I review more of the details provided I might require additional information.

Thank you for your time, patience and consideration in this matter.

Sincerely,

James N. Patnaude

9 Withams Road
Newark, DE 19711
August 3, 2004

Mr. Al Hirsch
Unit Chief
Security Division
Federal Bureau of Investigation Headquarters
935 Pennsylvania Avenue, NW
Washington, DC 20535

Dear Mr. Hirsch,

As I indicated in my previous memo dated July 22, 2004, the more I reviewed the Excised Copy of my Security Clearance Revocation the more questions that have arisen.

The items missing or requiring additional explanation are as follows:

1) I have not received any material related to my July 22, 2004 request.

2) There were no FD-302's provided reflecting the telephonic interviews conducted by SA Cartledge. These would be useful in addressing some of the accusations.

3) I would like a copy of the Baltimore CART report, especially in light of the fact that the hard drive was returned in an inoperable condition.

4) I would like a copy of the report related to the removable computer media. This is especially important since some of the statements in the excised documents conflict with each other and the evidence sheets.

5) I would like a copy of the Baltimore NIPC. This is especially important since the independent computer examine does not support their findings.

6) I would like a copy of the Cryptographic and Electronic Analysis Unit (CEAU) report for the same reasons stated in 5) above.

7) An EC on 04/04/03 refers to a complete report contained in Serial 104. This document has not been provided and obviously has relevance to my response.

8) The 10/08/02 EC by SA Williams refers to my use of the computer system at Aetna Hose Hook & Ladder Co. (referred to as Newark Fire Dept). Not to split hairs but I have held all offices up to and including Deputy Chief, which was the position I held when the Bureau hired me. I regularly printed out my daughters' school reports on the fire department computer because of the increased color and pixel capabilities. These were at various hours because my daughters usually informed of the need the evening before the respective report was do and because people call for fire and emergency medical service at various times throughout the

day. I was never asked by anyone about my use of the department computers so I would like a copy of the report of the interview that this comment was made on.

9) The memo prepared on 09/16/02 by Maurice Hurst refers to dates that I allegedly mishandled documents prior to the use of the CCTV. I would like a copy of the document that these comments are based upon so that I can accurately address and refute these accusations.

10) I would like a copy of the CCTV film for the dates 05/20/02 through 05/30/02. I am sure that this will assist me in demonstrating that I did not make a habit of removing restricted documents from the office.

11) I request a copy of the analysis of my personnel computers that discovered hacker tools, etc as referred to in the same memo my by Maurice Hurst on 09/16/02.

12) In the same 09/16/02 memo by Hurst, on page 5 he refers to sensitive documents removed from my home and indicates that I targeted certain types of documents. I would find the document or conversation that this was based on very informative and useful in my defense.

13) I would like a copy of any documents related to my alleged mishandling of documents in August 2001. Again, I am trying to address accusations and inferences that suggest I made a habit out of removing sensitive or restricted documents.

14) I would like to get a copy of any and all OPR documents that I am allowed or have these documents provided to the DOJ ARC. It would appear that their investigation and interviews were significantly more thorough, objective and conducted with a degree of professionalism that would allow me to defend myself without prejudice or undocumented inference.

Thank you for your time, patience and consideration in this matter.


Sincerely,

James N. Patnaude

# EXHIBIT 9

9 Withams Road
Stafford II
Newark, DE  19711
July 28, 2004

Ms. Joanne W. Simms, Chair
Department of Justice, Access Review Committee
Room 1112
Main Justice Building
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20535

Dear Ms. Simms,

I am writing to contest the revocation of my Top Secret security clearance by the
Federal Bureau of Investigation (FBI), my employer, and to specifically address the
charges that have been leveled against me.

Let me begin by stating in the strongest possible terms that I have never, at any time,
been involved in the conveyance or unauthorized disclosure of any information or
committed, had knowledge of or ever thought of the commission of any act of espionage
or any other violation that would fall under that definition. In addition, any reference to
my involvement in any activity related to crimes against children is fictitious. I repeatedly
offered to verify any and all statements I made to the FBI's Office of Professional
Responsibility (OPR) investigators by submitting to a polygraph examination. I reiterate
that offer to you with the same request that I made of OPR, which was that the examiner
not be from the Baltimore Division. That being said let me bore you with my explanation
of the circumstances, as I understand them to be, of my situation.

I tried for many years to enter service with the FBI in a Special Agent position. After
several unsuccessful attempts and appeals, I had the opportunity to enter service in a
support position, which I viewed as a Godsend. Better to support the effort then observe
from a distance. As you can see from the attached timeline, I approached my work with
enthusiasm and zeal. I was able to bring many work and educational experiences to the
workplace that is not in abundant supply at the Bureau.

Working at the Bureau has given me the opportunity to work with some of the finest
people I have ever met. It has also forced me to work with some of the worst. I would
never do anything intentionally to jeopardize my position at the Bureau. I tried for too
many years to get in and my family has made too many sacrifices for me to even consider
the accusations made against me.

This whole incident has cost me my marriage, since I would not resign when the
AUSA threatened, resign or face charges. My former attorney can verify this and I will
contact her regarding these threats should you desire.

Did I make a mistake by removing documents? Yes, an unfortunate mistake that I have regretted every day since I made it. Would I remove box loads of classified documents? Not on my mothers grave. My initial EEO complaint was basically a request to be reassigned to another squad away from the two supervisors. Common sense tells you that I would not do anything with these two individuals breathing down my neck constantly. SSA Jordan was so petty as to say that he didn't like the fact that I occasionally put my foot on my desk. I had broken my ankle in June 2001, missed one day of work, and came in with a walking cast. I put my foot up to keep the swelling down. This is what my day-to-day work life degenerated to.

I have addressed the accusations put forth and as you can see I have requested to appear personally before the ARC.

### Conveyance / Unauthorized Disclosure

I stated in my sworn statement, on 01/09/2004, to the Inspection Division (formerly Office of Professional Responsibility) investigators, SSA Fragomeli and SSA Hayden that, based upon my review of a list of the documents they provided, I had, in fact, removed sensitive and/or classified material from the office. Baltimore Division Security Officer SA Larry Faust prepared this list. I had not been provided with a list of documents seized on the night of the search so this was my first opportunity to view a list of the documents I was accused of removing. I did not intentionally remove any of these materials. I had intended to remove only non-sensitive documents relevant to the preparation of a written response to a warning Performance Appraisal Report (PAR) that I had received that Tuesday of the same week. I have included a copy of this PAR, which was forwarded to me from the Performance, Recognition and Award Unit on February 17, 2004. I was not allowed to keep this document the evening of the search. (I have also included an Electronic Communication (EC) that is strikingly similar dated November 11, 2001 from SSA Jordan and my response to that EC. I never received any feedback or response to my reply) I also wanted to ensure that Baltimore Division supervisory personnel did not covertly access or review any documents relating to an Equal Employment Opportunity (EEO) complaint I had filed against SSA Jordan and SIRS Tamburrino.

I do not have the habit of taking sensitive and/or classified investigative materials from the office. I routinely take non-restricted training materials that are related to my participation with the Baltimore Division HAZMAT team and evidence response team, as well as materials related to the use of computers in crimes, white supremacy and hate groups, materials related to middle eastern cultures and practices, etc. I have taken books such as the Turner Diaries (related to white supremacy groups) and the Primer to Islam home to read. My intent was to broaden my knowledge base on these subjects and others and to remain as current as possible in these fields. I can provide the names of the personnel that I borrowed these publications from should you so desire. I have also removed foreign language tapes from the office. These tapes were borrowed from the Language Unit a FBIHQ. I had obtained permission, through the e-mail system, from

Security Officer Faust to remove these tapes. I do not personally have a copy of the e-mail available, but I am confident it can be retrieved from the system for your review should you desire.

Since my arrival at the Bureau I have been highly motivated and driven to during an above average job. I would routinely take on tasks that other Intelligence Research Specialists (IRS's) would not. This included, but was not limited to, making training presentations, taking over the accounting for the Innocent Images Initiative (III) undercover projects, maintaining the Maryland Metropolitan Office – Calverton (MMOC) telephone system, developing liaisons with other divisions, law enforcement agencies, etc.

My willingness to take on extra duties and to assist anyone who needed help in the unit caused some friction between myself and other IRS's in the office.

I had stated in my sworn statement to OPR investigators on 06/26/2003 that I did not recall receiving specific instructions from any of my supervisors, either SSA or IRS's about the policies that existed relating to taking work home. It was obvious that the more motivated and aggressive agents took work home. Although it did not seem as common a practice among support employees, I did so to maintain a high level of service to the divisions I was assigned, to maintain a high level of output and work ethic and to ensure that I covered all leads in a timely fashion.

I always took security precautions seriously. I offer the following as examples, but this is not meant to be an all-inclusive list:

1) I always secured III materials when I was assigned to that squad. I was one of the few that did not leave images, etc. out on my desk or in an unsecured fashion.

2) I always followed the specified security procedures to secure materials related to the accounting and funding of III undercover operations. The SSA at the time acknowledged my performance with a Time Off Award.

3) Whenever I traveled for the purpose of providing training or making presentations on behalf of the III, I never checked the UC (undercover) PC or related materials through as others did, but rather kept them in my possession.

4) When I was transferred to Squad 20 in the Woodlawn office (Baltimore Division HQ), I requested that working locks be installed in my desk and cabinets so I could secure materials. This request was denied.

5) When I was assigned to a FISA activity, which was my first exposure to handling classified materials, I was subject to some harmless ridicule because I engaged the lock on the FISA room. I immediately was informed that it was not common practice to lock the FISA room. It was felt that since it was alarmed that was

sufficient protective measures. My locking the door on my arrival caused a minor uproar since the keys could not be readily located.

6) Even though my workspace had no locks, I made it a routine practice not to leave any classified or sensitive material out at night. This was not a routine practice within the squad and the Security Officer made it known that there would be no "desk checks" after the events of 09/11/2001 due to the volume of classified documents being processed. I would leave material related to the FISA activities in the FISA room if it was the last thing I worked on that night and was the first thing I planned to work on the next morning. This room was located in a separate building across the parking lot of the Woodlawn office.

7) As I previously noted earlier in this memo, I obtained permission from the Security Officer to remove Arabic language tapes that I had borrowed from FBIHQ. These tapes are the same type available in bookstore or online.

The accusation and inference that I removed classified or restricted materials on a routine basis over a period of time is false. My review of the limited number of documents provided to base my appeal does not offer any information to support this claim. SIRS Tamburrino inquired on one occasion, I believe in August or September 2001, as to what materials I was taking home. I had recently completed a course on evidence collection at WMD scenes and had a drill at the Maryland emergency center approaching so I wanted to review. I informed SIRS Tamburrino of this and offered to show her the materials. She declined and went off in a huff. At a much later date, probably January or February 2002 I had signed out a laptop PC from the Information Systems department to do some work at home. SIRS Tamburrino later told me that she would not allow it so I returned the PC and did not take any further action. I do not remember what specific work I was planning on doing that evening.

The statement that the support supervisor confronted me about removing documents is also false. At this point the tension with the SSA and SIRS and myself was so great that if it were really believed I was doing anything out of the norm they would have taken immediate action. I was submitting daily reports, had my hours changed and was under constant scrutiny for the slightest infraction. Conversely, if it were truly believed that I was not complying with security standards the SSA/SIRS were remiss for not taking immediate action. To let suspect activity continue is like saying, "We know he planted a bomb, lets see if he plants a bigger one".

Most of my interaction with both parties, especially the SIRS were unpleasant at this time. I found it necessary to document some of the interactions by preparing Electronic Communications (EC's). I have included some examples in the Relevant Document section. Obviously, I do not have access to all such EC's since some are still in my workspace.

I sincerely believe that my concerns regarding the possibility that Baltimore supervisory personnel might attempt to access and/or review documents related to the complaints I filed with EEO were justified.

Some of the reasoning for my concerns is based on the following:

- I had received a voice mail message on my work phone from a Special Agent (SA) that I had worked with on Innocent Images. The gist of the message was that he had been in the office late on the Friday night before the 2002 Memorial Day weekend. He was assigned to a Safe Streets squad at this time. He had observed SSA Jordan along with another SSA and an SA apparently searching my workspace. I called the SA that left the message at home over the weekend and he confirmed the contents of the message.

- SIRS Tamburrino has a documented history of including fabricated information in another IRS's PAR. When the IRS went to verify the statements SIRS Tamburrino had made, it was discovered that the statements had not been made and were fabricated by SIRS Tamburrino. I believe this event was documented in her employment file. I can also provide the name of the IRS that this was done to for the purpose of verification.

- SIRS Tamburrino polled many of the SA's that I had provided support to over a given review period and only included material that she could present in a poor light. She went as far as to volunteer to draft an EC for an SA saying that my work was unsatisfactory. He declined and reported this to his SSA.

- SIRS Tamburrino has a documented history of poor interpersonal and management skills. I have been told, but never saw the actual report, that her deficiencies were significant enough to warrant comment in the 2001 Inspection Report.

- In my opinion, SIRS Tamburrino has questionable ethical standards. It is common knowledge among the members of Squad 20 that she conducts work related to her interior decorating business out of Bureau space. I am not sure of the extent or exact nature of all her conduct but can provide reference to those who are more knowledgeable. Her business is apparently successful enough that the Internal Revenue Service cited her for underpayment of income several years ago. This underpayment occurred prior to my arrival on the squad but was the source of periodic sarcastic and humorous comments by others on the squad.

- I believe, but I am not certain that SIRS Tamburrino has had her personnel vehicle serviced at the Baltimore Division garage. This belief is based on the fact that not too long after my arrival on the squad she asked me to give one of her personal checks to a garage mechanic and indicated it was for work done on her vehicle. The mechanic seemed a little uncomfortable when I dropped the check off.

- My initial dealing with SSA Jordan was not only unpleasant but led me to question his ethical standards. When the SIRS position announcement was posted there were three persons who applied. Myself, another male IRS who had extensive military and management experience and IRS Tufts, who had seventeen years experience as a secretary and three years as an IRS. When the KSA packages were submitted, a comment was made to the Administrative Officer that it looked like Tufts was outclassed. Suddenly, SSA Jordan, who has been a close personal friend of Tufts for a number of years, was on the career board for this position. After the original career board, the applicants were informed that there would probably be another career board interview convened because of major disagreements between the panel members. A decision was not made in what would be considered the normal length of time. In the end the Chief Division Counsel (CDC) had to render an opinion that allowed the SAC to award Tufts the position. I have included a copy of the sworn statement I gave to the EEO investigator that provides additional detail surrounding this event. I would have expected that based strictly upon ethical standards and professional appearances SSA Jordan would have removed himself from the process. Instead, it is my understanding that he insisted on his inclusion and successfully pushed for the least qualified individual to be awarded the position. Incidentally, I feel the other male was probably the most qualified since he had more management experience.

- SSA Jordan is the Employee Assistance Program ( EAP ) contact in the Baltimore Division. I reported to him, as required by Bureau policy, that I was seeing a counselor and was on medication for panic attacks. This information was to remain strictly confidential and the condition was not serious nor did it affect my work performance. Several weeks later I had occasion to amend my health insurance benefits and SIRS Tufts specifically commented that people only upgraded to the premium package because it covered counseling costs. I had never discussed insurance, health care cost or coverage or any medical condition with Tufts. I did not think it is a big stretch of the imagination that SSA Jordan had told Tufts of my condition.

- At this time, SSA Jordan was in charge of the applicant squad. I went to speak to him because I had questions concerning my past rejections for a Special Agent position because of a color deficiency in my eyes. I had met several employees who were agents with the same condition that would have applied around the same time. Former Director Freeh's driver had recently become an SA and it was common knowledge that he had the same color deficiency condition. When I made my inquiry, SSA Jordan proceeded to offer details about this individual that I felt were not appropriate and was a violation of privacy requirements. They included comments as to the results and number of times the individual had to take a polygraph test and the reasons for his previous failures, details about his driving record as well as disclosing another medical condition the individual suffered from. I was left with the impression that SSA Jordan not only exercised

poor judgment by freely discussing another individual's personal data but also had ethical issues regarding people's rights to privacy.

- Lastly, after being harassed and harangued by SIRS Tamburrino while deployed after 09/11/2001 and later because of my involvement in responding to anthrax calls, I approached the Administrative Officer regarding her management style. He even guessed the subject of my concern when I approached him. A few days' later he said that he would take no action because SSA Jordan complained about me when he discussed my concerns with him. I called SSA Jordan at home, I was working the weekend Command Post, and he went into a tirade stating that I went behind his back, broke the chain of command and that he "would take this to the mat". The last statement was presented in a manner that I considered to be a threat. He then hung up before I could speak. My previous impressions of SSA Jordan's ethical and managerial barometer were only reinforced by this event.

## Child Pornography Accusations

As I stated in my opening paragraph, I have never, at any time had anything to do with child pornography except work related activities of an investigative or training nature. The materials recovered from my residence were in the media tray that I had taken home because of the concerns that I have expressed above. If the Bureau has provided you with pictures of my residence at the time of the search you can clearly see that the media tray is located on a teacart in my dining room, in plain sight and nowhere near the computer system. You will also note that my knapsack, which was searched the previous evening, is on the dining room table near the media tray. If I was in anyway involved in such a reprehensible activity or thought that I had taken any materials home that would be considered inappropriate, I had ample opportunity to get rid of them and would not have left them in plain view in my dining room. You will hopefully also note that there was absolutely no pornographic material contained in my residence. I didn't even have the Sports Illustrated swimsuit issue. If it would assist you in your determination, I will sign whatever releases are required for you to have access to my Safeguard tests and evaluations. In addition, should you so desire, I will sign any release necessary for you to discuss this with my counselor and if there is a fee involved, I'll pay it.

I believe that the ZIP disks that I had in the media tray contained the training presentations and associated materials that I had used while assigned to Innocent Images. I believe it was common practice at the time for people to retain the training materials that they had created. Most presentations contained material from the squads shared drive and would be customized to the group the presentation was being given to. For instance, the presentation to the Georgia Police Chief's Association would have contained information on cases recently adjudicated in Atlanta division, and would hopefully have included cases that were worked in conjunction with local and state agencies. I have verified, through telephonic communication, that there was no policy in effect at the time, which required the return and/or destruction of these types of training materials. I made

this verification with two former Program Managers from the Innocent Images Initiative, SSA Jack Boyle and UC Jorge Martinez.

When I was transferred from Innocent Images to Squad 20, the Information Systems group from Baltimore moved the computer system I used at the MMOC to the Woodlawn office. This was because Innocent Images was upgrading their systems and the old units were being distributed throughout the rest of the Baltimore division. This unit that was moved contained a ZIP drive.

When I received new equipment as part of the Trilogy upgrades I no longer had a system with a ZIP drive. I do not and have never owned, rented or borrowed a ZIP drive for use at home or anywhere else for that matter. The computer equipment at Aetna Hose, Hook & ladder Company, referred to as Newark Fire Department in the case files, does not have ZIP drive capable equipment. The lap top computer that my former wife had at the time of the search did not have a ZIP drive; I am not sure what the capabilities are of the laptop she currently uses, but I do not have access to it.



During the review of the ZIP disks that were seized, I hope that the dates of the last access and/or change were noted. It was probably not long after my transfer to Squad 20. I believe I had provided training materials to personnel from the Atlanta divisions Innocent Images group. I had taught with them previously and they had requested copies of the presentations. I can provide the contact names to verify this should you desire.

Any removal of computer media that contained material from Innocent Images was unintended. I had removed the media tray after I was told my workspace had been searched because the tray contained disks that related to my EEO complaint and PAR documents I had prepared.

The statement that I was previously warned and admonished by the SIRS from Innocent Images is not only false but also intentionally misleading. The SIRS's opinion of SSA Jordan borders on hero worship and I feel she would make statements to support his position. All of the PAR's prepared by this SIRS rating my work were exceptional across the board. Although all of the PAR's she prepared were taken from me the night of the search, the actual ratings and hopefully copies of the PAR's should be in my employment file. This PAR's have not been returned to me for the purposes of filing my appeal.

Most of the verbal comments made to me by this SIRS were snide in nature. I can provide a very extensive list of agent and support employees who can attest to this and if you would like I can provide them starting in groups of ten. I always had the impression that these comments were a result of the tension that existed from my arrival at the Bureau. I had discussed this tension with both SSA's that managed the squad while I was assigned there, who basically agreed with my assessment. I can provide their names if you so desire.

I found it exceptionally convenient that the Innocent Images SIRS had "informally documented" her verbal exit interview of me when I left the Innocent Images squad.

I discussed this "exit interview" with OPR investigators on 06/26/03. I had indicated that I was asked if I had any investigative materials to which I responded that I did not. The OPR investigators asked if this was documented to which I responded that I was not aware of any such documentation. I feel that the "informally documented" correspondence that the Innocent Images SIRS offered while being interviewed by Baltimore division case agents may not have been offered to the OPR investigators since theirs was a sworn statement. I was not provided a copy of this "informal documentation" to respond to in my appeal.

At the time of my transfer from Innocent Images there were two (2) computer media items charged out of evidence to me. I believe, but I am not completely certain that the indicated media were CD's. The PAR's from SSA Jordan and SIRS Tamburrino were not returned to me on the night of the search and the relevant evidence reference was contained therein.  I had checked with the case agent, SA Alexis Vlahos and the evidence technician, Daryl Henry on a few occasions in an effort to verify that I had indeed returned this material to the case agent. In my final conversation with SA Vlahos concerning this matter we both agreed and were fairly comfortable with the fact that I had returned the media to him and that the specific items were under his desk with a large volume of other media that related to the same case. We also were fairly comfortable that the disks were probably in his possession and the evidence sheets had not been updated to reflect the return yet. Based upon these conversations and the belief that I had returned the disks I took no further action and felt that I had answered the SIRS's questions concerning evidential material truthfully. I did not consider the training materials to be investigative material and therefore did not consider them in my response for the reasons stated above.

Lastly, I will sign whatever documents are required to allow you access to my Safeguard records, which were taken during my time on the Innocent Images Squad. In addition, I will authorize the release of my records or allow interviews of the counselors I have seen during this wonderful period of my life to allay anyone's fears of my reasons for having the aforementioned ZIP drives. Lastly, I will gladly answer any questions you like while under polygraph examination should you so desire.

### Access and Audit of Various Databases

Rather then address each any every record of my access to the various databases reviewed and noted in the case files I would prefer to make a general statement that addresses all the queries I made.

1) Theoretically, after each inquiry, I would generate an attachment for the specific case file that the query related to. These attachments were either taken from me on the evening of the search or are still in my workspace and are obviously not currently available to me. I have requested these documents from the Reinvestigation Unit.

2) Data mining is a common technique used not only in the law enforcement and intelligence community but also in the financial and research communities. If, while making a query on a name, address or other piece of data I discovered a cross-reference to another file I would pursue it with the hope of finding a correlation. As an example, I was looking up an address for an SA from the FCI squad. I determined that three individuals resided there and ran each of their DMV records. Because I had done some previous background research I was aware of the date that Israel gained its independence. Two of the three individuals at this location had this date of birth listed on their DMV records. I did a lot more research on these individuals then would normally be done and provided it to the case agent. I am not sure what the final disposition of this matter was. For your information I have attached a copy of a book that is available on the Internet and specifically addresses data mining for data related to counter terrorism.

3) I had the reputation of not only being able to find out information that other IRS's did not routinely provide but I did it with no complaining or making the requesting person wait hours or even days. If someone needed something looked up real fast I would take the few minutes it would take, do it and be done with it. I did not always prepare an attachment because the amount of time to retrieve the data was less then the time to generate the attachment. I was the first IRS people would encounter entering the squad from the main hallway and as a result received and processed numerous data requests that were not assigned to me but that I could complete quickly and with little fanfare.

4) I have attached a draft of the location of my work area in the squad. As can be seen, I am the first IRS someone entering the area would come across and therefore it is logical to assume that I would be asked to do checks by persons in a hurry or not aware of other squad members. This drawing is from memory from two years ago and may not be 100% accurate but it should illustrate my point.

## Computer and Computer Related Media Accusations

I am thoroughly confused at what the final accusations are related to what I had and what I did not have on my computer and related media, with the exception of those charges related to Child Pornography (CP), which I explained above.

A 12/20/02 EC states that I had CP on my Zip drive. I do not own one nor do I have access to one.

There are references in several of the EC's provided by the Security Division to me of having "wiping" software, "hacker software", "PGP (encryption) software" and "steganograghy" software on my personal computers. I will address this in the paragraph below but I note the following. None of these reports have been made available and the hard drive of my personal computer was returned, "fried ", otherwise known as inoperable. It would be hard for me to defend against these accusations but I have been fortunate that I was able to have the hard drive rebuilt and recovered at my expense. It

was then reviewed by and reported upon by an expert in the field. I find it extremely coincidental that the hard drive was returned in what might be thought to be unusable condition, therefore denying me the ability to defend myself against the accusations and associated implications.

I have attached a copy of Mr. Russell Yawn's report in the Independent Forensic Computer Examination section. Mr. Yawn conducted a complete forensic computer review of my hard drive. If you cut through all the computer geek stuff the end result is that none of the material that was alleged that I had on my computer was there.

I am acquainted with Mr. Yawn from my relationship with the Birmingham Innocent Images Unit. Our prior dealings would not influence Mr. Yawn and quite the contrary if I had done anything illegal or unethical he would have forwarded the information to the FBI Birmingham office and not to me. I have attached some of Mr. Yawn's biographical data and he would never risk his reputation or standing in the geek community for the likes of me. As you can see he is on the Board of Directors of The International Association of Computer Investigative Specialists. In this capacity I believe he is currently in charge of the certification of individuals who conduct forensic examinations of computers. I believe the Bureau's CART examiners have to be certified by this organization, but I am not positive. In addition, Mr. Yawn is utilized by the Department of Justice and the United States Secret Service to standardize procedures for related to the seizure of computers and related documents. He is currently involved in updating the Secret Services Computer Seizure Guidelines, which are reviewed by DOJ. Lastly, Mr. Yawn is a member of the Secret Service Response Team for computer crimes. Mr. Yawn can be reached directly at the telephone number and/or e-mail address provided on the letterhead of his report.

I have also attached documentation related to Mr. John L. Wiechman from TLSI Inc. Since my hard drive was so thoroughly corrupted that Mr. Yawn originally could not recover or restore any data, he forwarded the drive to Mr. Wiechman's firm to rebuild and recover the data. Although I paid for the services of the restoration, I had no other contact with the firm to avoid any hint of impropriety. I have also attached a copy of Mr. Wiechman's experience and credentials.

I have also included a copy and highlighted the respective section of Mr. Phalen's memo to me dated July 15, 2004 in the Independent Forensic Computer Examination section. I have done this to illustrate that two years later the information is still being clarified and statements being changed. This illustrates the inconsistencies that I currently face with the data made available to me to date. Last but not least, I have enclosed the two FD-597's that I signed. As far as I can determine the only thing kept were the two Zip disks noted above.

### References to Other Removals of Documents

_There are several references and accusations made regarding other alleged removals of documents from the office. As I previously stated, except for the unintentional removal

noted above, for which OPR determined that I should receive five days off, I do not have the habit of removing classified documents from the office. During my interview with OPR investigators I voluntarily offered once previous instance regarding the handling of documents. Prior to 09/11/01, the British intelligence service had acquired a copy of the Al-Quada Terrorist Manual. The manual was and still is available in its entirety on the Internet. Unbound copies of the manual were available in the office. In addition, for a period of time the manual was posted on the DOJ website. I took one of the unbound copies for reference purposes and when time allowed read certain sections. At one point, bound copies were made available in the office. I took a bound copy and one night took it home to finish reading a certain section. Once home, I noticed at the very bottom of the manual, in the smallest size print on the cover that the manual was not supposed to be removed from the office. There were no classification markings or any reference anywhere else in the manual. I secured the manual in my bedroom and returned to the office the next day. I believe I mentioned it to the Domestic Terrorism SSA who did not seem concerned.

As for all other references to me removing documents from the office I have not seen any documentation or statements. In addition, as I previously noted, by this time, the SSA or SIRS probably would have accused me of theft had I returned late from lunch.

I also take exception to the statement that I had previously placed a gym bag in my private vehicle. Because there were no pictures of the search of my vehicle, I am hoping that the security tapes of the parking lot where my vehicle was located can be recovered to verify this point. I will readily admit that I am not entirely positive but I am fairly certain I left with everything for the evening at the same time. SA Jim Parker (?) and I had a conversation in the parking lot prior to me reaching my car and being escorted back in. He joked with me about the number of bags I had with me. I believe SA Parker is now retired but I am sure he can recall the situation because we were discussing SSA Jordan and SIRS Tamburrino. In light of the ensuing events I would be fairly confident that he would have fairly good recall of the situation.

In closing, I respectfully request that my Top Secret clearance be reinstated. Prior to this event I not only had no disciplinary or security infractions, but also had an excellent work record. It was made clear to me by OPR that they considered this an isolated, unintentional violation. I hope you have the ability to review their report because it appears to be the only independent, professional and ethical investigation into this matter.

I appreciate the time it took to get through this document. If you require any clarification or additional information please contact me immediately at 302-737-3136 (Home) or 302-584-5675 (Cell).


Sincerely,

James N. Patnaude



Company Info
Contact
Search
Cart

Data Mining and Data Analysis for Counterterrorism

Home

Africa

Americas

Asia

Business and
Economics

Energy and the
Environment

Europe

Foreign Policy and
International
Relations

Global Aging

International
Communications

Middle East

National and
International Security

Religion

Russia and Eurasia

Science and
Technology





# Data Mining and Data Analysis for Counterterrorism

Mary DeRosa

Defeating terrorism requires a nimble intelligence apparatus that operates actively within the United States and makes use of advanced information technology. Data-mining and automated data-analysis techniques are powerful tools for intelligence and law enforcement officials fighting terrorism. But these tools also generate controversy and concern. They make analysis of data—including private data—easier and more powerful and this can make private data more useful and attractive to the government. Data mining and data analysis are simply too valuable to prohibit, but they should not be embraced without guidelines and controls for their use. Policymakers must acquire an understanding of data-mining and automated data-analysis tools so that they can craft policy that encourages responsible use and sets parameters for that use. This report makes practical recommendation for such guidelines and controls.

**Mary DeRosa** is a senior fellow in the CSIS Technology and Public Policy Program. An attorney, she has previously served on the staff of the National Security Council as special assistant to the president, as special counsel the Department of Defense, and as an attorney for the Advisory Board on the Investigative Capability of the Department of Defense.

CSIS Report
32 pp.
March 2004
0-89206-443-9 (pb)

**Price:** $12.95

In Stock





OC DEF SQUAD

| | IRS |
|---|---|
| | SA? |
| | SA |
| | IRS |
| | IRS |
| EMPTY | IRS |

| SA | SA |
|---|---|
| SA | EMPTY |
| IRS | IRS |
| IRS | IRS |
| SA | FORFEITURE |
| SA | PARALVAUDE |



VCMO SQUAD

| SQUAD 20 SSA | SQUAD 20 ADMIN ASST |
|---|---|

INFORMATION SYSTEMS

# EXHIBIT 10

 65X-BA-102169           SECRET

items from the residence revealed the presence of some tools such as a "wiping" program, Pretty Good Privacy (PGP) encryption software, and steganography (masking a file within another file, such as a photograph) software. After these discoveries, Baltimore referred the analysis of all the items to the Cryptographic and Electronic Analysis Unit (CEAU), ERF, Quantico. That analysis was completed and did not result in the discovery of any classified information or evidence of FBI material having been on the machines. The additional burden of examining the Newark, Delaware Fire Department hard drives has added to the time and effort required to complete the analysis task.

(U) (S)  On 10/2/2002, all the items seized from Patnaude's residence, with the exception of one ZIP disk containing child pornography images, were returned to Patnaude.

(U) (S)  Investigation at Newark, Delaware determined that Patnaude was an Emergency Medical Technician (EMT), Newark Fire Department (NFD). Patnaude had unrestricted access to NFD computers located at several fire stations. Investigation determined that Patnaude was observed entering and exiting NFD facilities during early morning hours. When asked why he was at the NFD at that hour, he responded that he was using the computer. NFD has been cooperating with the FBI investigation of this matter and made their computers available to Baltimore CART. The hard drives on the computers were imaged and are being examined.

(U) (S)  Interviews: A total of 16 FBI employees (agent and support) were interviewed about their knowledge of Patnaude. Interviewees included peers and supervisory personnel. The consensus was that he was a good employee, but some of his co-workers suspected that he was taking work out of the office. As a result, he was warned and admonished by supervisors about this. At the time of his transfer from the Innocent Images Initiative (III) squad in Calverton to a general IRS position in Baltimore, his IRS supervisor documented that she advised him no materials from the III workspace could be taken out of the area and had him verbally confirm that he had not done so, to include taking any materials to his residence. The IRS supervisor informally documented that she had this conversation with Patnaude and signed and dated the paper. She maintained custody of the paper until she was interviewed about this matter, at which time the item became part of the IA portion of the investigative file.

(U) (S)  A total of five interviews were conducted in connection with the investigation relating to the Fire Department, Newark, Delaware.

 SECRET

# EXHIBIT 11

(Rev. 08-28-2000)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                          **Date:** 03/12/2002

**To:** Baltimore                  **Attn:** CDC Robert W. Chamberlain
                                              Squad 1

**From:** Baltimore
        **Contact:** IRS James Patnaude (410) 281-0253

**Approved By:** Patnaude James N

**Drafted By:** Patnaude James N:jnp

**Case ID #:**   67E-HQ-1262349

**Title:**       JAMES N. PATNAUDE
                INTELLIGENCE RESEARCH SPECIALIST (IRS)
                BALTIMORE DIVISION

**Synopsis:** Request to review enclosed documents for release to private
counsel.

**Enclosures:** Attached to this communication is a manila envelope which
contains documents that relate to  comments and accusations directed
to me by the supervisory personnel of Squad 20.

**Details:** I would like to have the attached information reviewed and
where necessary redacted so that I can release it to my attorney. The
materials relate to personnel issues that I have attempted to rectify.
To date, the situation has only become worse.  I have tried to address
this situation within the system but feel that this is no longer
possible. I have certain documents that I wish to release to legal
counsel that I have retained to address this problem. Please review
these documents to assure that I am only  releasing information that
is in compliance with Bureau policy.

        I have included comments that were made to me for your
review to assure I am in compliance with Bureau requirements. It is my
understanding that any verbal communications related to this matter do
not require preapproval to discuss with my attorney as long as they do
not refer to specific investigations, techniques or practices. I have
provided the enclosed in order to assure that all information I plan
to disclose is proper. I would appreciate your opinion on future
verbal communications so as not to limit my ability to respond to my
attorney nor waste your time reviewing that which does not have to be
reviewed.

To:  Baltimore  From:  Baltimore
Re:  67E-HQ-1262349, 03/12/2002


    I appreciate your assistance in this matter and would like to
make it crystal clear that I am proud to be an employee of the Federal
Bureau of Investigation and have always put one hundred percent into
my work. I truly regret that this situation could not be resolved in
the normal course of business and appreciate any time that you have to
expend to respond to my request.

```
To:  Baltimore  From:  Baltimore
Re:  67E-HQ-1262349, 03/12/2002
```

**LEADS:**

**Set Lead 1:**

<u>BALTIMORE</u>

<u>AT BALTIMORE, MD</u>

Please review attached documentation and determine
to what extent it can be released to my outside legal counsel.

♦♦

3

# EXHIBIT 12