**U.S. Department of Justice**

Federal Bureau of Investigation

---

In Reply, Please Refer to
File No.

7142 Ambassador Road
Baltimore, MD   21244

April 22, 2002

Mr. James Patnaude
Federal Bureau of Investigation
Baltimore Division

Dear Mr. Patnaude:

          This is in response to your Freedom of Information-
Privacy Acts (FOIPA) request for the Supervisory Intelligence
Research Specialist (SIRS) for Squad 19/21 and the Intelligence
Research Specialist, GS-12.

          We have completed a search of the automated indices to
the central records system maintained in Baltimore and material
responsive to your request has been located.

          Please be advised the material responsive to your
request is too voluminous to be processed using the resources of
this office.  Accordingly, we have referred your request to FBI
Headquarters for processing.  The FOIA Section will maintain your
request by order of receipt and will assign it for processing in
turn.

Headquarters will assign your request a FOIA number and advise you of that number as soon as possible. Any future correspondence concerning this request should be directed to FBI Headquarters, FOIA Section, 935 Pennsylvania Avenue, N.W., Washington. D.C.  20535-0001.

Sincerely yours,

Lynne A. Hunt
Special Agent Charge

By: *[signature]*
Robert W. Chamberlain
Chief Division Counsel

# EXHIBIT 13



**U.S. Department of Justice**

Federal Bureau of Investigation

---

In Reply, Please Refer to
File No.

7142 Ambassador Road
Baltimore, MD 21244
February 14, 2002


Mr. James Patnaude
Baltimore Division

Dear Mr. Patnaude:

        This is in response to your Freedom of Information-
Privacy Acts (FOIPA) request for specific records contained in
your personnel file.

        Based upon the information you furnished, a search of
your personnel file maintained in the Baltimore Office located no
written documents by Supervisor Tamburrino or Squad Supervisor
Jordan relating to your most current PAR. There is however,
a copy of your current PAR.



                            Sincerely yours,


                            Lynne A. Hunt
                            Special Agent in Charge



                            By: _____
                            Robert W. Chamberlain
                            Chief Division Counsel

# EXHIBIT 14

*Russell Yawn*
*Post Office Box 302*
*Pelham, Alabama 35124*
(877) 260-3348
ryawn@hiwaay.net

Report Prepared For
Jim Patnaude
9 Withams Road
Newark, DE 19711

July 6, 2004

Examination Report
-------------------------------------

### Steps Taken

To simplify the explanation of what was done, I have provided the following information that outlines the standard processing procedures that I followed when processing this hard drive and other media. The International Association of Computer Investigative Specialists (IACIS), of which I am a member, recommends these procedures.

1.  All software utilized is licensed to, or authorized for use by, the examiner, and should be noted that this examination was conducted using equipment and software that is the property of the examiner and nothing used in this exam belongs to or is the property of the State of Alabama. It should be further noted that this examination was conducted on this examiner's personal time and did not take place during normal work hours.

2.  The questioned media was received in an Hewlett-Packard computer, model number. The questioned media, a Western Digital hard disk drive, bearing serial number WM3690372217 was removed from the listed computer. In previous conversations with Jim Patnaude, it was learned that this hard drive was returned to Jim Patnaude in a non-functioning condition.

3.  The hard disk drive bearing serial number WM3690372217 was shipped via FedEx to TLSI, located at 123 N. Belt Line Road Grand Prairie, Texas 75050-5816. TSLI is a commercial venture that, in part, will recover the data off of a non-functioning hard disk drive.

4.  On Friday, April 30, 2004, this examiner received via FedEx two (2) CD-Roms containing EnCase type evidence files. These files were made by employees of TSLI and shipped so that this examination could take place.

Examination Report
------------------------------------

### General Findings

**Device**

| | |
|---|---|
| Actual Date: | 04/26/04 12:55:44PM |
| Target Date: | 04/26/04 12:55:44PM |
| Total Size: | 2,000,388.096 bytes (1.9GB) |
| Total Sectors: | 3,907,008 |
| CHS: | 3876:16:63 |
| File Integrity: | Completely Verified, 0 Errors |
| EnCase Version: | 3.22g |
| System Version: | DOS 7.10 |
| Acquisition Hash: | 87559C72D9EA552876759D36E95788E5 |
| Verify Hash: | 87559C72D9EA552876759D36E95788E5 |

**Partition Table Info**

The partition table shows only one (1) partition for this drive

| Type | Name | Status | Start | Stop | Relative | Size |
|---|---|---|---|---|---|---|
| 0b | FAT32 | 80 | 0:1:1 | 967:63:63 | 63 | 902913 |
| 00 | None | 00 | 0:0:0 | 0:0:0 | 0 | 0 |
| 00 | None | 00 | 0:0:0 | 0:0:0 | 0 | 0 |
| 00 | None | 00 | 0:0:0 | 0:0:0 | 0 | 0 |

**Volume**

| | | | |
|---|---|---|---|
| File System: | FAT32 | Drive Type: | Fixed |
| Sectors per cluster: | 8 | Bytes per sector: | 512 |
| Total Sectors: | 3,902,913 | Total Capacity: | 1,994,375,168 bytes (1.9GB) |
| Total Clusters: | 486,908 | Unallocated: | 151,191,552 bytes (144.2MB) |
| Free Clusters: | 36,912 | Allocated: | 1,843,183,616 bytes (1.7GB) |
| Volume Name: | HP_PAVILION | Volume Offset: | 63 |
| OEM Version: | MSWIN4.1 | Serial Number: | 1470-0FF6 |
| Heads: | 64 | Sectors Per Track: | 63 |
| Unused Sectors: | 63 | Number of FATs: | 2 |
| Sectors Per FAT: | 3,808 | Boot Sectors: | 32 |

Examination Report

------------------------------------

## *Specific Findings*

In response to a phone call by Jim Patnaude, this examiner volunteered to conduct an examination on Patnaude's hard disk drive. (This examiner first met Jim Patnaude as a task force officer during training for the Birmingham Field Office. Innocent Images Initiative.) Patnaude wanted to know what was on this hard drive. if anything, of a questionable nature.

This examination was conducted as any other examination, that is, this examination was conducted based upon the facts known. There are reportedly allegations that Jim Patnaude has questionable material on his personal computer. After verifying the integrity of the evidence file, the files contained on this hard disk drive were hashed and the known files were removed from being displayed. Known files are those files that do not change with the day-to-day operation of the computer. Since these files do not typically change, if these files contained on the questioned media are identical to the known files, they can be considered unnecessary to examine further.

Further examination revealed the following;

MACHINE SPECIFIC REGISTRY KEYS

### System Details

| | |
|---|---|
| Registered Owner | Pat Patnaude |
| Registered Organization | Montell. USA |
| Product ID | 16297-OEM-0022802-77644 |
| Product Key |  |
| Version | 4.03.1214 |
| ProductName | Microsoft Windows 95 |
| InstallDate | 23 Jun 1997. 23:02:02 |

| | |
|---|---|
| Run Command Cache | c:\\1 |
| | C: \Setup.exe\1 |
| | aol\1 |
| | m:\setup.exe\1 |
| | ping 148.163.128.142\1 |
| | ping opssvr1\1 |
| | ping sum-tpa-remedy\1 |
| | c:\1 |
| | M:\ATX\Atxset.exe\1 |
| | "C:\WINDOWS\DESKTOP\Kristi Yamaguchi Fantasy Ice Skating it cool.lnk"\1 |
| | m:\setup\1 |
| | a:\install\1 |
| | m:\office97\1 |
| | m:\go\1 |
| | m:\1 |
| | c:\1 |
| | A:\SETUP\1 |
| RecentDocs Cache | CANDYLND.TXT |
| | Document.doc |
| | fireman-angel.jpg |
| | annie get your gun.doc |
| | What Freedom Means to Me.doc |

Examination Report

------------------------------------

```
                    gconman_generic.xs
                    2000 Patnaude P Tax Return.tax
                    savings 2000.xls
                    pccs dep care 2000.xls
                    95126734598.doc
                    KelseysProject.txt
                    New Text Document.txt
                    bio.doc
                    1241669745.doc
                    MSIMGSIZ.DAT
Find Command Cache
                    shutdown
                    cache4
                    cache2
                    cache1
                    cache5
                    cache3
                    iamgod.pps
                    tc99upd.exe
                    keough
```

One of the run commands entered by a user was "ping 148.163.128.142. This IP address resolves to:

```
OrgName:    Hoechst Celanese Corporation
OrgID:
Address:    3040 US Highway 22 West
City:       Branchburg
StateProv:  NJ
PostalCode: 08876
Country:    US
```

There were several key words that were searched for. These include "FBI", "secret", "innocent", "child", "steg", "prohibited", "classified", "sex", and "terrorism". It should be noted that the term "secret" would also return hits for words such as "top secret", as well as "steg" would hit on any reference to "steg" as well as "steganography". There were no hits, or no data, of relevance found on this hard disk drive. Furthermore, this examiner did not find anything of a controversial and/or prohibited nature on this hard drive.

As previously stated, this examination was conducted as any other examination, that is, from the very outset any evidence recovered during this examination would have been turned over to the appropriate state or federal agency. However, there is nothing to turn over as there is no evidence of any type of inappropriate activity or data found on this hard disk drive.

Russell Yawn
Certified Forensic Computer Examiner
Post Office Box 302
Pelham, Alabama 35124
(877) 260-3348



# IACIS

## The International Association of Computer Investigative Specialists

Search

| Home | Training | Certifications | Code of Ethics | Forensic Procedures | About IACIS | New Membership |

**About IACIS**

¤ The President

¤ Board

¤ List of Rules

# THE BOARD OF DIRECTORS

## Board Officers

**Chairman**
Russel Yawn

**President**
Bill Jeitner

**Vice-President**
Pamela King

**Treasurer**
Robert Spitler, II

**Secretary**
Bill Crane

## Directors

**Director**
Katja Koennecke

**Director**
Dewey Watkins, III

**Director**
Jay Verhorevoort

**Director**
Steve Guest

**Director**
Chris Pater

**Director>**
Al Hobbs

Copyright © 2004 International Association of Computer Investigative Specialists. IACIS®

# EXHIBIT 15

Baltimore, Maryland

SWORN STATEMENT

I, Jeffrey R. Williams, Special Agent, Baltimore Division of the Federal Bureau of Investigation (FBI), do hereby solemnly swear to the following:

I have been advised by Supervisory Special Agent (SSA) Fred J. Gregory of the Office of Equal Employment Opportunity Affairs (OEEOA) of the FBI, that he is investigating a complaint of employment discrimination (F-03-5803) pursuant to Title 29 of the Code of Federal Regulations, Part 1614.

I understand that the claimant is James N. Patnaude, and that the issues under investigation are whether he was discriminated against based on his sex (male) and age (44) when 1) sometime after March 27, 2002, he was advised that he was not selected for the IRS position in the FBI's Baltimore Division for which he believes that a less qualified female was selected (Vacancy notice #02-BA-414); (2) whether he was subjected to harassment (hostile work environment) on the bases of his sex (male) and age (44), including but not limited to the following incidents: he was not assigned high quality case work; a Supervisory IRS made a comment to him that he was a know it all, and that he did not have adequate

Affiant's Initials  JRW

interpersonal skills; he was assigned work while he was

detailed out of state; and a SIRS requested a Special Agent to

sign an electronic Communication that complained about his

work; and (3) whether he was discriminated against in terms

and conditions of his employment on the basis of reprisal for

his previous involvement in the EEO process, including but not

limited to the following incidents:  he was given a 90 day

warning evaluation and placed on administrative leave with

pay; on May 24, 2002, his work area was searched; on May 28,

2002, he received an unsatisfactory performance review; on May

30, 2002, his personal belongings and personal vehicle were

searched, and most of his belongings were kept; on May 31,

2002, his residence was searched, and his personal computer

was seized; and on June 4, 2002, his credentials, building

pass, credit card and equipment at his residence were seized.

Name: Jeffrey R. Williams

Enter on Duty Date: 11/07/1999

Date of Birth: ▇▇▇▇1969          S

Gender: Male

        I have been assigned to the Baltimore Division my

entire career.  I have primarily worked White Collar Crime

(WCC) matters since assigned to the division.  I recall in

2001 I was working a complex WCC case involving a substantial

telemarketing fraud matter that involved approximately 37,000
victims.  The investigation eventually resulted in four trials
and several convictions.  I remember during the investigation
there were certain tasks that needed to be done which I felt
an IRS could assist.  The particular tasks were of a nature
that I thought an IRS capable of doing analytical work rather
than a Financial Analyst would be more suited to perform this
work.  For example, I needed a detailed organizational chart
constructed suitable to be used in court.  I also needed a
detailed analysis of 1-800 numbers used by the subjects
suspected of committing the fraud, to include matching numbers
with certain suspects, reviewing and analysis of billing
records, etc.  In addition, I needed data bases of potential
victims to be reviewed and analyzed.

    I spoke to Supervisory IRS Teresa Tamburrino about
assistance and she assigned Mr. Patnaude to the matter.
It soon became obvious to me that either Mr. Patnaude was
putting forth very little effort, or did not know how to
complete these tasks.  I found it difficult to believe he
would not know how to complete at least some of these tasks
since a lot of the work was not that complicated, it was just
time consuming.  I recall advising SIRS Tamburrino that I was
either not getting the work I requested from Mr. Patnaude, or

the work was so sub standard it was not useable.  After a period of time I gave up on the prospect of Mr. Patnaude completing the work, and essentially did the work myself. With trial dates looming, I could not afford to postpone having the necessary work done.

I remember that a couple of times that Mr. Patnaude was around me he made comments that indicated to me he did not like SIRS Tamburrino.  However, I am not aware of the details of what his issues may have been with her.  He never indicated to me that he felt she was discriminating against him.  I also remember having a conversation with SIRS Tamburrino in which she asked me how Mr. Patnaude was doing with his assignments. I advised her words to the effect that the work he performed had not met my expectations, and that I would have to redo much of the work myself.  I don't remember SIRS Tamburrino asking me to document my observations of Mr. Patnaude's performance in writing.  In fact, I believe at the time I just assumed she was asking me for feedback about his performance for some type of write-up she may be preparing.  SIRS Tamburrino never asked me to approve any document she may have drafted about Mr. Patnaude, which would not have been my place to do so.  I also remember Mr. Patnaude later coming to me and stating that he needed to respond to a document about his

Page 4 of _6_ pages                    Affiant's Initials  _JRP/_

performance. I remember he asked me if I would be willing to provide information that indicated the reason why some of the tasks he worked on for me had not been completed, such as the tasks were complex, or he had been given a lot of work. Essentially, he wanted me to provide reasons which would justify his performance. At that point I was busy with this case, and more importantly did not believe it was my role as an agent to be involved in any performance issues involving Mr. Patnaude, and I conveyed that sentiment to Mr. Patnaude.

Other than being aware he is no longer working in the Baltimore Division, I cannot provide any specific information about issue three of Mr. Patnaude's complaint of discrimination.

In addition, I cannot provide any information about issue one of Mr. Patnaude's complaint. I am aware of Mr. Patnaude's gender, but do not know his age. I found out that Mr. Patnaude was participating in an EEO complaint when contacted by SSA Gregory regarding this matter. I never witnessed SIRS Tamburrino or any other employee harass or discriminate against Mr. Patnaude.

I do not have any knowledge of any additional information that I believe is relevant to the scope of the inquiry as described to me by SSA Gregory.

Page 5 of  6  pages                    Affiant's Initials  _____

I have read this statement consisting of this and five other pages. The entire statement is true and complete to the best of my knowledge and belief. I understand that the information I am giving is not to be considered confidential and that it may be shown to interested parties.

_Jeffy R. Williams_
Jeffrey R. Williams

Sworn to and subscribed before me at Baltimore, Maryland, on this ___ day of March 2004.

_____
Robert W. Chamberlain
Chief Division Counsel
Baltimore Division

Page 6 of 6 pages                    Affiant's Initials _____

# EXHIBIT 16

(01/26/1998)

# FEDERAL BUREAU OF INVESTIGATION

**Precedence:** ROUTINE                          **Date:** 01/03/2001

**To:** Baltimore                    **Attn:** SA Jeffrey R. Williams
                                            Squad 5

  **From:** Baltimore
        Squad 20
        **Contact:** IRS James Patnaude, 410-281-0253

**Approved By:** Jordan Kim Howard

**Drafted By:** Patnaude James N

**Case ID #:** ~~████████████~~ (Pending)

**Title:** ~~████████~~
        TELEMARKETING FRAUD

**Synopsis:** To update status of subpoena information requested in relation to the investigation of ~~█████████~~ and related associates for telemarketing fraud.

**Details:** SA Williams in conjunction with the United States Postal Inspection Service has been investigating subject JOEL KATZ for his organization and involvement in a nationwide telemarketing fraud operation. Subpoena's were requested from the U.S. Attorney's office for subscriber information related to several "800" numbers that were used in the fraud.

     After inquiries by SA Williams it was determined that the subpoenas were not prepared or forwarded to the respective service providers until several months after his original request. It is assumed that part of this delay is attributable to the events of 09/11/2001. As a result, information was not yet available for Telephone Application input and analysis by the original projected due date.

     In addition, the original lead requested a review of available records to identify additional victims. It was determined that the information required was not readily available and as a result additional victims were identified by telephone interviews performed by the Special Agents and Postal Inspectors.

     Lastly, after discussion with the respective Assistant United States Attorney (AUSA), SA Williams has indicated that there is no longer a need for an organization chart as originally indicated in the original lead.

To: Baltimore  From: Baltimore
Re: 196A-BA-98503, 01/03/2001


       SA Williams is requested to reset the lead for Telephone Application input and analysis when the relevant subscriber records become available. IRS Patnaude will contact the respective service providers to ascertain an approximate time for the receipt of the requested records.

To:  Baltimore   From:  Baltimore
Re:  196A-BA-98503, 01/03/2001

**LEAD(s):**

**Set Lead 1:**

BALTIMORE

AT BALTIMORE, MD

Read and clear.

♦♦

# EXHIBIT 17

Senate targets local FBI agents                                    Page 1 of 3

**baltimoresun.com**

————— advertisement —————

**It's like finding $20 in your laundry.**

Follow Buck for free and easy answers to even your hardest financial questions.



http://www.baltimoresun.com/news/local/crime/bal-te.md.fbi13may13,0,5633940.story?coll=bal-home-headlines

*From the Baltimore Sun*

# Senate targets local FBI agents

## Judiciary panel opens probe into possible perjury related to Luna case

By Matthew Dolan
Sun reporter

May 13, 2006

The U.S. Senate Judiciary Committee has opened a probe into whether FBI agents in Baltimore committed perjury during the investigation into the mysterious death of federal prosecutor Jonathan P. Luna in 2003.

In a letter to the director of the FBI, committee Chairman Arlen Specter and ranking member Patrick J. Leahy wrote that a confidential report indicated that FBI officials gave "conflicting stories during interviews with agents of the FBI's Internal Investigations Section."

The Sun first disclosed the Department of Justice inspector general's report in January. It raised questions about whether an FBI supervisor in the Baltimore office improperly ordered the interrogation of a junior agent rumored to have had an affair with Luna.

Citing a story published in The Sun in January, the committee leadership requested and reviewed a copy of the inspector general's report. In the May 10 letter, the senators told FBI Director Robert S. Mueller III they needed additional documents to judge whether agents might have given false statements or lied under oath.

"We have received the letter, and we will be responding to the senators," Michael R. Kortan, section chief of the FBI's office of public affairs, said yesterday.

The unsolved death of Luna, a 38-year-old assistant U.S. Attorney in Baltimore, continues to haunt the FBI. His body was found more than two years ago, on Dec. 4, 2003, with 36 stab wounds, lying in a remote Pennsylvania creek.

Senate targets local FBI agents                                                    Page 2 of 3

While a Lancaster County, Pa., coroner ruled Luna's death a homicide, other law enforcement sources familiar with the probe raised the question of suicide, noting Luna's knife found at the scene, his substantial credit card debt and his failure to take a polygraph test for an internal investigation into $36,000 missing from a drug case he prosecuted.

In the midst of its high-profile investigation of the death, the FBI was forced to question its own officials because a Baltimore-based FBI agent accused her supervisor of misconduct.

She complained that fellow agents inappropriately grilled her about unfounded rumors of an affair with Luna, the internal report said.

The female agent later filed an internal complaint charging that the FBI's then-acting special agent in charge of the Baltimore division, Jennifer Smith Love, improperly ordered two agents to interrogate her and later approved an illegal search of her computer.

## Futile to complain

In a previously undisclosed memo to FBI Deputy Director John S. Pistole in June 2005, Inspector General Glenn A. Fine concluded that evidence showed Love approved the computer search even after the female agent had revoked her consent.

Evidence also showed, according to Fine's memo, that Love told the female agent that filing a complaint would be futile because Love would handle it as a performance matter.

The interview of the agent conducted by acting assistant Special Agent in Charge Linda B. Hooper and Special Agent Marina Murphy in Baltimore boxed out the investigators assigned to lead the probe into Luna's death, according to the inspector general's report. It also focused on the private sexual life of an FBI agent who had been ruled out as a likely suspect, officials wrote.

Investigators concluded that the treatment of the female agent sparked dissension in an FBI field office under enormous pressure to find out how the federal prosecutor died.

Despite the internal tumult, senior FBI officials cleared Love, as well as the two agents who conducted the interrogation, of misconduct and took no disciplinary action. Hooper and Murphy, who both denied any wrongdoing, received promotions before the internal investigation reached its conclusion.

In August 2004, the inspector general's office of the Justice Department intervened, eventually finding enough "credible evidence" of wrongdoing to conclude that the case should have been sent through the FBI's formal disciplinary process, rather than handled as a less severe performance issue.

Pressed again about the issue, the FBI reopened the investigation in 2005, sending it through its disciplinary process. Once again, senior FBI officials concluded that no action was warranted against Love, Murphy and Hooper. Hooper has since retired from the FBI, officials said.

Officials familiar with the congressional probe said that a referral for criminal charges against FBI agents was not a likely outcome. Instead, they said, the senators were exercising their oversight role of the nation's largest law enforcement agency.

In 2002, the Justice Department's inspector general concluded that "the FBI suffered and still suffers from a strong, and not unreasonable, perception among employees that a double standard exists within the FBI." An independent commission report in February 2004 echoed those concerns about the image

of lenient treatment of supervisors while junior agents face more severe discipline.

FBI officials in Washington have said that reforms recommended by the commission have been implemented. Egregious cases cannot be dismissed out of hand and are now automatically referred to the Office of Professional Responsibility for possible discipline, officials said.

## Questions for Mueller

In the bipartisan letter, Specter, from Pennsylvania, and Sen. Charles E. Grassley, from Iowa, both Republicans, join Leahy, a Democrat from Vermont, in raising new questions for Mueller about the internal investigation surrounding Luna's death.

They asked Muller if he had been aware of conflicting statements made by supervisors about Love's actions. According to the letter, the senators also want to know which agents were promoted while they were under investigation and whether those agents had been reviewed first for a "lack of candor."

The senators set a deadline of May 26 for the FBI to hand over the documents. They told Mueller they also want FBI staff to meet with them about the lingering questions from the internal investigation.

"Anytime you have reports of conflicting statements by FBI agents, it's a serious matter and needs some attention" Grassley said in a statement released last night. "We look forward to getting the documents from the FBI so we can get to the bottom of this."

**matthew.dolan@baltsun.com**

*An FBI agent who was promoted before an internal investigation had been concluded was misidentified when this article was published in the print edition. The Sun regrets the error.*

*Copyright © 2006, The Baltimore Sun | Get Sun home delivery*

> Get news on your mobile device at www.baltimoresun.com

# EXHIBIT 18

(01 26 1998)

# FEDERAL BUREAU OF INVESTIGATION

Precedence:  ROUTINE                        Date:   11/19/2001

To:  ██████████                  Attn:  SSA  Kim J██████
                                        ASAC Kevin L██████████
                                        CDC  Robert O███████████

From:  ██████████
       Squad ████
       Contact:   IRS James Patnaude, ████████████

Approved By:  Patnaude James N

Drafted By:   Patnaude James N

Case ID #:  ████████████████     (Pending)

Title:  JAMES N.PATNAUDE
        INTELLIGENCE RESEARCH SPECIALIST (IRS)
        ██████████████████

Synopsis:  Response to documentation of performance and actions
for improvement.

Administrative: Reference EC from ████████████ J██████ dated
11/13/2001.

Details:  In response to the communication referenced above I
have responded to each point noted in the original communication
and will provide further background in an effort to shed
additional light on the current situation.

██████████████ Case Agent ███████████████, ██████████.

The leads assigned on 07/02/01 were approached with the intent to
be completed in their original format. Upon examination of hard
copies of documentation, databases that were loaded onto my hard
drive, and other relevant information, it was determined that
analysis of data regarding the amount of sales by subject was not
possible. In an effort to clarify the contents of the data bases
in our possession, I contacted the data base contractor that
maintained the system until it was shut down as a result of the
pending charges. The contractor was of the opinion that we did
not have the necessary data to accomplish our initial objective.

After discussion with Case Agent ███████████, as well as the U.S.
Postal Inspector assigned to the case, it was determined to
attempt to identify as many "800" numbers from existing
documentation as possible. This procedure was not contained in

To: ████████████████████████.
·Re: ██████████████ 11/19/2001

the original lead. With this information, it was hoped that I
would be able to tie the various "boiler room" operations with
the principal subject in the case. In conjunction with the Case
Agent, another Squad ● agent and the Postal Inspector, I reviewed
all seized documents trying to accumulate a complete list of all
the "800" numbers utilized by the operation. I prepared a summary
list that was reviewed by the Case Agent whom eliminated certain
numbers that he was previously aware of.

I then obtained the names of the telephone companies that numbers
were available for and prepared the information for subpoena.
Normally we are able to contact a toll free service for the
information but because of the age and time periods involved the
service indicated that a subpoena would be required. The
necessary subscriber information was provided to the U.S.
Attorney's Office by the Case Agent. It was determined that there
was an extreme delay on the part of the U.S. Attorney's Office in
preparing the subpoena's. They were not forwarded until after a
significant period of time from the original request.

The time line that was created was the result of several
variations and adjustments following input from the Case Agent. A
copy of the disk which contained the time line was provided to
the Case Agent because of the anticipated changes that would be
requested by the AUSA after her review. The Case Agent made the
requested changes on his laptop while he was still at the U.S.
Attorney's Office. This resulted in quicker resolution of the
anticipated changes. The Case Agent also took this opportunity to
change some of the colors and fonts to those that he prefers to
use versus the one's chosen by myself. At no time did the Case
Agent indicate that the time line was "of no value".

The preparation of the organizational chart was determined to be
of no value to the documentation process by the Case Agent and
the AUSA and was therefore cancelled as part of the lead.

As was the case with the organizational chart, the diagram of the
principals and associates involved in the scheme was also deemed
to be of little value and therefore was also cancelled.

An attempt was made to determine if any of the diskettes seized
could provide coherent information on the financial operations of
the primary subject. This task was not in the original lead but
required several days to complete. I looked at 172 diskettes,
most containing multiple files. I had consulted with the
Pocatello facility and it was determined that, for the number of
disks involved, it would probably be more expedient to review the
disks in Baltimore. I reviewed each disk, performing a key word
search, with no useful additional information being obtained.

2

To: ██████████████████████
Re: ██████████████████████

It has come to my attention that SIRS T██████████ took it upon
herself to try to gather the "800" number information independent
of the previous efforts. It appears that her objective was to
obtain the subscriber information without the use of a subpoena.
Apparently she was informed that subpoenas were required because
of the age and changes in ownership. I had previously determined
this fact. After speaking with the case agent to accurately
respond to the communication it appears that SIRS T█████████ is
going out of her way to find fault with my work.

██████████████████ Case Agent ███████████████████████

In late October, 2001 I returned to my work station from the
██████████████████ lab located on ████████ Street and found
approximately 20 images with a post-it attached that read "Scan
these into ██████████████ H Drive with the appropriate file
reference". In as much as I do not have a scanner I had to find
one that was available. The images were scanned onto a disk and
an unsuccessful attempt to forward them to SA ███████████ H Drive
was made. I had to process suspicious mail, using proper safety
precautions and make another trip to the ████████████████ lab
located on ████████ Street. I informed SA █████████ of the first
unsuccessful attempt and that I would try again upon my return.
While at the ████████████████ lab, I also processed a suspicious
package that the lab had received, which delayed my anticipated
time of return. The contents turned out to be parasite samples
which are routinely received for testing. Upon my return and
another unsuccessful attempt to scan the images, I sought the
assistance of a Computer Specialist. She informed me that I do
not have access to the Case Agent's H Drive and she set up a loop
through my L Drive which still did not work. By that time of the
evening there was no one else to assist me in trying to complete
this task. The next morning I attempted to locate the Case Agent
and the pictures to no avail.

██████████████████████ CASE AGENT ███████████████████████

I wish I could shed light on this item but have no specific
recollection of the information that TFO H████ requested. I have
searched control files, ACS and the I-drive and can find no
evidence of a lead be assigned to me relevant to this case. I do
remember TFO H████ requesting assistance in obtaining a subpoena
in the absence of whomever the IRS he normally deals with. My
recollection could be inaccurate but I believe the Squad
secretary was not in on the day of the request and was working
4-12pm the next day. I believe I left the required information on
that next day. I assumed the paper work would have been returned
to the IRS assigned to the case. I also have to question why if

To: ██████████████████████
Re: ████████████████     11/19/2001

this was such a concern the first inquiry of me regarding the
status of this subpoena was not until I received the
communication from SSA J█████ on Monday, November 18,2001.

In regard to the check of ████ uploaded documents and the
statistical comparison with other IRS's, this is misleading.
Initially I was not assigned specific cases during a portion of
this time period and was specifically told that I was to be
training in the use of various data bases with SIRS T████████
In addition, I was told there would be an expected learning curve
as I made the transition from Squad 21 to Squad 20.  Also, for
several days, I was essentially glued to the NCIC/ChoicePoint
terminals completing inquiries for an SA from the U.S. Customs
Service. The number of inquiries was large enough to require the
use of a binder and was organized in a format that I have used on
numerous occasions while on Squad 21, with no complaint. SIRS
Tamburrino severely criticized the format and indicated that she
had to re-organize it but never provided any information on the
supposed deficiencies.  I spent all my time with the Bureau prior
to his arrival on Squad 20 with Innocent Images where the
documentation process is different. I will make every effort to
adequately document in accordance with Squad 20 policies and am
trying to adjust to documenting every minuscule transaction.

During this time period I was also assigned a case involving the
███████████████  This case is being worked in conjunction with
the ████████ and ███████████ Field Offices and involves a
significant amount of documentation and detail. During this time
period I began to familiarize myself with the subjects,
activities and background of the investigation. I reviewed
numerous documents provided by SA's M████████ and N███████. I
attended a meeting which included representatives from WFO and
the ████████████████████████  The objective of this meeting was
to identify additional subjects based on surveillance films and
to identify future objectives.

Around this time SIRS T█████████ inquired as to my the progress
of █████████  She was informed of the changes in the leads
and the focus of future work, that was noted above, at this time.
She also indicated her dissatisfaction as to my proficiency
level with ACS. She was informed at this time that I had received
no formal training in ACS since my arrival at the Bureau and had
basically learned as I went. I was also informed that "You come
off like a know it all" during this conversation. I inquired if
there was any part of my work that she was satisfied  with to
which she responded,  "At least you show up for work". I welcome
constructive criticism but found these comments both offensive
and unwarranted.

4

To: 
Re:

I discovered that I was assigned to the Command Post, on Sunday,
November 3, 2001. I was not scheduled to work on this date but
came in to try to catch up on my paperwork. I had hoped to use
the next week to catch-up on my paperwork and was obviously
disappointed about this assignment since I would not have access
to my computer. I expressed my opinion to SA Bingham with whom I
had been talking. At this time SIRS S▓▓▓▓▓▓▓▓ felt it was her
place to interject her opinion. I was not aware that I wasn't
allowed to have an opinion on schedule changes. During my week in
the command post I observed reactions to changes in the schedule
by other employees that were much more colorful then my own.

This interaction did raise a question as to employee privacy in
as much as SIRS T▓▓▓ voiced more then a passing knowledge of the
growing tension concerning my HazMat duties and Squad 20's
supervision. It would appear that one of the supervisor's was
discussing personnel information with SIRS Tuft's. If this is the
case I would find this to be extremely inappropriate.

I completed my assigned schedule in the Command Post and
volunteered to work the Saturday shift on November 9, 2001, which
SIRS T▓▓▓▓▓▓▓ was attempting to fill. In addition, I feel if
any of the supervisor's that were present during my shifts in the
command post were asked about my attitude and performance, the
response would be very positive.

In response to the statement that I approached the AO to complain
about my assignment to the Command Post and requested to speak to
the ASAC, intending to circumvent the chain of command, I can
only say that this is false.

On Tuesday, November 5th, I asked the AO if I could stop by
regarding a question that I had. I was unable to speak with him
until Thursday, November 7th because of my Command Post
assignment. Upon entering the AO's office, before I gave any
indication as to the nature of my visit, he said "Let me guess,
it's about T▓▓▓▓". I confirmed that the nature of my visit did
relate to concerns I had about my relationship with SIRS
T▓▓▓▓▓. I had approached the AO for advice because on several
occasions during my involvement with the HazMat team, SIRS
Tamburrino's demeanor towards me was obviously negative. At my
request, SSA S▓▓▓▓▓▓, who is in charge of the HazMat team,
indicated that he had spoken to SSA J▓▓▓▓ and would do so again.
I was under the impression that I was to work with HazMat related
matters until the crisis mode was concluded.

The AO proceeded to say that he was not surprised that I was
having a problem with SIRS T▓▓▓▓▓, that her management style
had been specifically mentioned during the inspection process and

To: ██████████████████████████████
Re: ██████████████████  11/19/2001

that nothing had changed. At this time he stated that he felt SSA
J██████ would not follow up on the inspection recommendations. I
mistakenly thought the AO was being humorous at this time and
thinking I was making a joke in response to a joke said that SSA
J██████ was ready to retire. It became painfully obvious that I
had misread the AO's intent. He indicated that he would speak to
the ASAC about the situation at some point during their trip the
next week. He also indicated that he would arrange a meeting with
the ASAC upon their return. At no time did I request to speak to
the ASAC. The AO inquired if I could wait a week and also chided
that if he arranged such a meeting with the ASAC that I better
say something because in previous meetings regarding SIRS
T███████████ management style, employees were not as forthcoming
as anticipated. At no time did I intend or attempt to circumvent
the chain of command or comment negatively in any way about SSA
J███████. Since the only persons present during this conversation
were the AO and myself I would gladly submit to polygraph to
verify the veracity of my conversation.


As to the note that I performed in an exemplary manner in
fulfilling my HazMat duties I feel that this is a self serving
understatement so as not to appear vindictive. I participated in
the search of the ████████ including recovering the voice data
recorder, witnessed autopsies at ██████████ responded to numerous
anthrax threats and participated in the search of the ███
██████████████████ which resulted in my exposure to anthrax. I
was under the impression that since these were more time
sensitive issues that I was to work in my capacity as a member of
the HazMat team until further notice. I again verified this
belief with SSA S██████████. On slower days, I attempted to catch
up on paperwork related to my HazMat activities, tried to address
work that magically appeared on my seat with post-it notes
attached and attempted to perform what follow-up I could on the
work I was assigned prior to 9/11. This was not always possible,
because the SA's and other relevant parties were rarely
available. Most of these employees were also involved in the
investigation to the terrorist acts of 9/11.

I will check the log and make the appropriate entry on 11/05/01
for the eight hour shift I worked if I have not previously do so
already.

To provide additional information related to SSA J███████ written
communication I would like to relate the contents of two
telephone conversations I had on Saturday, November 9,2001.

Since I had an RDO on Friday, November 8,2001, when I checked my
e-mail on Saturday November 9,2001 I noted that I had received

To: ██████████████████████,
Re: ████████████, 11/19/2001

one from the AO. I called him at home since I knew he would be
out of town for the coming week. The AO related that I had better
think twice about talking to the ASAC and embarrassing myself.
This comment was based on the AO's conversation with SSA J████.

I then telephoned SSA J████ at home because I felt it was
important enough, especially since I would be out of the office
at training the following week. I asked SSA J████ what was the
nature of the AO's comment and he stated that I tried to go over
his head and didn't follow the chain of command. He also stated
that I balked at serving in the Command Post, and wasn't doing my
job. He then stated that I had alienated myself at the ██████
██, and that SSA P██████ and SIRS T███ stated that I did not
perform my duties while on Squad 21. He then stated that I was
running out of places to go and he wouldn't forget it. I
interpreted this to be an implied threat. SSA J████ then
restated that he wouldn't forget this and hung up. Realizing the
futility of speaking to a dial tone I returned to the Command
Post and completed my shift.

SSA J████ is misinformed about my previous performance.
Considering that I have never worked for SSRA T███, I can only
guess that he conveyed his displeasure with the fact that I
cannot control ███ or ███ at ███HQ. The ████████████ currently
has an ████████████████████ that required submission of
paperwork during the semi-annual renewal process. Since no one
was taking any action to facilitate this expansion in scope and
the deadline was approaching, I took it upon myself to assure the
request was included in the package. Failure to do so would have
resulted in a delay of six months. I also obtained the required
three bids for equipment purchase. An SA from ████████████ had
provided one bid that did not meet the required specs.  At the
time this particular renewal was submitted there was an acting
Section Chief whom was also the Unit Chief. The review and
approval process was obviously slowed down significantly. In
addition, during the process, the new Section Chief arrived, the
old Unit Chief left and the new Unit Chief arrived. ████ also
put off reviewing the Innocent Images proposals so they could all
be submitted together. Once final approval was obtained, I
prepared a Budget Enhancement to request the use of the funds to
purchase the equipment. This request also encountered delays and
resulted in me receiving several different days on which to
expect the money. SSRA T███ did not like the delays. Once the
money arrived, I arranged for one of an SA's to purchase the
equipment using his ███ credit card. Historically, we tried to
limit the number of SA's that purchased equipment to avoid
confusion and minimize paperwork. On our first trip to the
computer store the SA forgot his ███ identification and as a
result the equipment could not be purchased. The SA was not

To: ████████████████████,
Re: ███████████, 11/19/2001

available again for a period of time and as a result there was
another delay in the acquisition of the equipment. Once the
equipment was finally purchased I delivered it in person. In
spite of my efforts, apparently SSRA T███ feels compelled to
slight my work ethic.

In response to the accusation that I did not perform my job
requirements I offer the following:

| File Review Period | Critical Element #1 | Critical Element #2 | Critical Element #3 | Overall Rating |
|---|---|---|---|---|
| 02/16-05/01/99 | Superior | Exceptional | Exceptional | Exceptional |
| 05/01-08/01/99 | Superior | Exceptional | Exceptional | Exceptional |
| 08/01-11/01/99 | Superior | Exceptional | Exceptional | Exceptional |
| 11/01-02/01/00 | Superior | Exceptional | Exceptional | Exceptional |
| 02/01-05/01/00 | Exceptional | Exceptional | Exceptional | Exceptional |
| 05/01-08/01/00 | Exceptional | Exceptional | Exceptional | Exceptional |
| 08/01-11/01/00 | Exceptional | Exceptional | Exceptional | Exceptional |
| 11/01-02/01/01 | Exceptional | Exceptional | Exceptional | Exceptional |
| 02/01-05/01/01 | Exceptional | Exceptional | Exceptional | Exceptional |
| 05/01-08/01/01 | Meets Expectations ( New Rating System) | | | |

In addition, since my EOD on 02/16/1999 I have received the
following recognition:

Performance Award      June 30,1999
Performance Award      June 30,2000
Performance Award      June 30,2001

Certificate of Achievement May, 2000 National Center for Missing
                                    and Exploited Children

Time Off Award    16 Hours    April 16,2000
Time Off Award     8 Hours    No Date
Time Off Award     8 Hours    February 2,2001
Time Off Award    12 Hours    June 11,2001

On-The-Spot-Award  $50

Letter of Appreciation         ASAC Michael S. C███████
(To all ERT/HMRT members)      October,2001

I find it hard to believe, based upon the above cited
information, that either SSA P█████ or SIRS T███ would have
criticized my work. If additional information is needed as to
substantiate my work ethic I have had numerous SA's indicate that

8

To:  ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Re:  ▓▓▓▓▓▓▓▓▓▓  11/19/2001

they would verify my work ethic. I can start with groups of 10 if
you feel this is adequate.

Thank you for the opportunity to respond to your concerns.

♦♦

9

# EXHIBIT 19

Baltimore, Maryland

SWORN STATEMENT


I, Charles S. Mosebach, Administrative Officer, Baltimore Division of the Federal Bureau of Investigation (FBI), do hereby solemnly swear to the following:

I have been advised by SSA Fred J. Gregory of the Office of Equal Employment Opportunity Affairs (OEEOA) of the FBI, that he is investigating a complaint of employment discrimination (F-03-5803) pursuant to Title 29 of the Code of Federal Regulations, Part 1614.

I understand that the claimant is James N. Patnaude, and that the issues under investigation are whether he was discriminated against based on his sex (male) and age (44) when 1) sometime after March 27, 2002, he was advised that he was not selected for the IRS position in the FBI's Baltimore Division for which he believes that a less qualified female was selected (Vacancy notice #02-BA-414); (2) whether he was subjected to harassment (hostile work environment) on the bases of his sex (male) and age (44), including but not limited to the following incidents: he was not assigned high quality case work; a Supervisory IRS made a comment to him that he was a know it all, and that he did not have adequate interpersonal skills; he was assigned work while he was detailed out of state; and a SIRS

Affiant's Initials _____

requested a Special Agent to sign an electronic Communication
that complained about his work; and (3) whether he was
discriminated against in terms and conditions of his employment
on the basis of reprisal for his previous involvement in the EEO
process, including but not limited to the following incidents:
he was given a 90 day warning evaluation and placed on
administrative leave with pay; on May 24, 2002, his work area was
searched; on May 28, 2002, he received an unsatisfactory
performance review; on May 30, 2002, his personal belongings and
personal vehicle were searched, and most of his belongings were
kept; on May 31, 2002, his residence was searched, and his
personal computer was seized; and on June 4, 2002, his
credentials, building pass, credit card and equipment at his
residence were seized.

Name: Charles S. Mosebach
Enter on Duty Date: 05/24/1971
Date of Birth: ███████1949
Gender: Male

        I transferred to the Baltimore Division from FBI
Headquarters in 1989.  I have been the Administrative Officer
(AO) my entire time in the Baltimore Division.  I recall I was on
the interview panel that interviewed Mr. Patnaude when he applied

Page 2 of_7_ pages              Affiant's Initials _____

to the FBI for the Intelligence Research Specialist (IRS) position. I remember after he was hired, he was assigned to the Innocent Images Program in the Calverton Resident Agency (RA). He was later transferred to Squad 20 in Baltimore, and was under the supervision of Supervisory IRS (SIRS) Teresa Tamburrino. I remember when assigned to the Calverton RA, Mr. Patnaude was under the supervision of SIRS Susan Tufts. I remember this is when I first heard about issues with his work product. I remember SIRS Tufts advising me she was sometimes encountering difficulty in having Mr. Patnaude focus on his work. It seemed as if Mr. Patnaude wanted to involve himself in a multitude of tasks, such as participation on the Evidence Response Team (ERT) rather than his duties as an IRS. I also remember that SIRS Tufts expressed some concern that she thought Mr. Patnaude may be taking work home, but she was not positive.

After Mr. Patnaude transferred to Squad 20, SIRS Tamburrino experienced similar issues. Again, Mr. Patnaude was not completing his work in a timely fashion, often preferring to get involved in collateral duties such as ERT and Hazmat. I remember she asked me for direction in handling the situation, and I told her that to insure Mr. Patnaude understood his first priority had to be his job as an IRS, and if circumstances permitted, he could then participate in collateral duties. However, as I recall, the situation never appeared to improve,

Page 3 of _7_ pages                    Affiant's Initials _____

and Mr. Patnaude just did not seem either capable or willing to do a thorough job on the IRS assignments given to him.

As I stated above, I recall that SIRS Tamburrino sought my advice on the situation with Mr. Patnaude. I don't remember counseling her that she was being too tough on Mr. Patnuade, because that is not how I perceived the situation. I can only remember one other employee who worked under SIRS Tamburrino and complained to me about her. This employee, who is a female, felt she wasn't being treated fairly by SIRS Tamburrino. After I reviewed the situation, it was clear to me that this employee was simply upset that she was being asked by SIRS Tamburrino to do her job. It is my impression of SIRS Tamburrino that as a supervisor she is fair, and simply expects the employees under her to do their job. I don't remember Mr. Patnaude ever speaking to me about SIRS Tamburrino and complaining about her treatment of him. It is possible he said something to me, for instance a short conversation in a hallway, etc., but if he did I just don't remember it. I can say with certainty I would have remembered if Mr. Patnaude had advised me he that he felt SIRS Tamburrino was discriminating against him, because I would have followed through on any such type of allegation.

I can only recall one other employee in which I discussed Mr. Patnaude's work efforts. I remember that the former SSRA of the Wilmington RA, Jeff Troy, needed some work to

be done by an IRS.  I remember I contacted SARA Troy by telephone
and advised him I could send Mr. Patnaude to perform the IRS work
he needed accomplished.  I remember that SARA Troy stated that he
did not want Mr. Patnaude sent to the RA to perform the work.
This conversation was probably approximately two years ago, so I
don't remember all the details.  However, It was clear from the
conversation that Mr. Patnuade had done work for the RA in the
past that obviously was not well received.  I do remember being
surprised at how adamant SSRA Troy was in not wanting Mr.
Patnaude assigned to do the work.

Concerning Mr. Patnaude's specific issues in his
complaint, I was not involved in the career board regarding the
position he references in issue one.  My only knowledge of issue
two is the information I have provided above about Mr. Patnaude's
work performance under SIRS Tamburrino.  Concerning issue three,
I was aware that Mr. Patnaude was placed on administrative leave.
However, I wasn't involved in any of the decisions regarding the
searches, his being placed on administrative leave, and his
Bureau property being obtained from him.  However, I believe it
is standard procedure when an employee is placed on
administrative leave that they are required to turn in their
Bureau issued property.

I am aware of Mr. Patnaude's gender, but do not know
his specific age.  I never witnessed or had any reason to believe

Page 5 of _7_ pages                    Affiant's Initials _____

that Mr. Patnaude was discriminated against by any employee of
the FBI.  As the AO, if I had suspected such, I would have taken
immediate action.  Mr. Patnaude never advised me he felt he was
being discriminated against.  It is my belief that any issues
that SIRS Tamburrino had with Mr. Patnaude were solely related to
his performance, and nothing else.

I was unaware, officially, that Mr. Patnaude had filed
an EEO complaint until SSA Gregory advised me on the telephone in
connection with his conducting this investigation.  Approximately
one month ago I was informed by another employee that Mr.
Patnaude may be filing an EEO complaint, but I had no information
what the complaint concerned or that it was related to age or sex
discrimination.

I do not have any knowledge of any additional
information that I believe is relevant to the scope of the
inquiry as described to me by SSA Gregory.

I have read this statement consisting of this and six other pages.  The entire statement is true and complete to the best of my knowledge and belief.  I understand that the information I am giving is not to be considered confidential and that it may be shown to interested parties.

_Charles S Mosebach_
Charles S. Mosebach


Sworn to and subscribed before me at Baltimore, Maryland, on this _26_ day of March 2004.

_Fred J. Gregory_
SSA Fred J. Gregory
EEO Investigator

# EXHIBIT 20



Precedence:  ROUTINE                      Date:  11/13/2001

To: ██████████              Attn:  ASAC ████████. L██████

From: █████████

        Contact:  SSA K████████ J████████

Approved By:  ████████████

Drafted By:  ████████████:jag

Case ID #: ████████████

Title:  JAMES N. PATNAUDE
        INTELLIGENCE RESEARCH SPECIALIST (IRS)
        ████████████

Synopsis:  Documentation of performance and actions for
improvement.

Details:  James N. Patnaude was transferred to Squad ██, the
████████████ e Squad, on 5/14/01, from ████████████,
Squad 21.  A review of IRS Patnaude's performance has revealed
significant deficiencies in his case assignments that need to be
addressed:

██████████  Case Agent ████████████

        Assigned three leads on 7/2/01:

        1.  Analysis of data regarding amount of sales by
            subject
        2.  Prepare organizational chart
        3.  Diagram of principals and associates involved in
            the scheme

        A time line was created by IRS Patnaude; however, it
was judged of no value by the case agent.  The 800 numbers have
been identified by IRS Patnaude and grand jury subpoenas issued
with no results from the phone companies to date.  Other leads
remain uncompleted.

██████████  Case Agent ████████████

        In late October, 2001, IRS Patnaude was directed to
scan approximately 20 photographs into a JPG file.  He saved

these as a text file, which proved of no use.  SA ████████ had to
complete the task himself.

████████████    ███ ████████  Case Agent ████████████████

     During the week of 8/13/01, IRS Patnaude was assigned
to do a subpoena for a telephone subscriber.  No record of the
subpoena can be found in case files, control files, in ███, or
the I-drive.  It is believed that it was not done.

     A check of ███ uploaded documents and the I-drive for
Squad 20 communications or documents created by IRS Patnaude for
the time period 5/14/01-9/11/01 reveals four (4) documents
prepared.  This is compared to other IRSs as follows:



     It would appear that IRS Patnaude is inefficient and
ineffective in his position as an IRS.

     It is noted that IRS Patnaude has received significant
training as a HAZMAT specialist and has performed in an exemplary
manner in fulfilling his HAZMAT duties.  However, his primary job
as an IRS has suffered.

     On 11/2/01, Supervisory IRS T██████ T██████████ assigned
IRS Patnaude to the ██████████ command post to maintain a daily
log.  He objected to this assignment and approached the AO
requesting to speak with the ASAC.  When advised that he should
speak with his squad supervisor, IRS Patnaude made a derogatory
comment about the squad supervisor, intending to ignore the
office chain of command.  It is noted that on 11/5/01, he made no
entries into the log for his eight hour shift.

     As a result of IRS Patnaude's actions and activities,
he is judged not to meet the expectations of his supervisor in
critical element #3, Researching and Analyzing, and #4, Relating
with Others and Providing Professional Service.

     Therefore, effective immediately, IRS Patnaude will be
provided further training to improve his skill level.  He will be
provided ███ training immediately as well as ███████ training,
for which he is scheduled.

2

To: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓
Re: ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓

He has been removed from the HAZMAT Team until such time as his IRS performance improves and he meets his supervisor's expectations.

IRS Patnaude's work schedule will be modified from his previous flex time hours to a normal 8:15 a.m.-5:00 p.m. shift to allow for greater supervisor oversight and availability for training.

IRS Patnaude will be placed on Daily Reports to more closely monitor his training and job performance. These reports will be submitted daily to his immediate supervisor.

It is the goal of the writer to provide appropriate training and guidance to IRS Patnaude to develop him into an efficient and effective asset to the ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ Squad.

♦♦

3

# EXHIBIT 21

May 25, 1995


Louis J. Freeh, Director
Federal Bureau of Investigation
9th and Pennsylvania NW
Washington, D.C.  20535

Dear Director Freeh:

I am writing in a final attempt to obtain a position as a Special Agent with the Federal Bureau
of Investigation.  As I approach the maximum age for employment I feel that it is important to
make this effort.  I applied several years ago and was not successful because of a color vision
deficiency.  I then made an appeal to the Special Agent In Charge of Recruiting in
Washington, D.C. and again was unsuccessful.

As you can see from the enclosed copy of my original application and appeal, I do not feel that
my color vision would adversely affect my performance nor has it had a negative impact in
other areas.  In addition, I have obtained contact lenses which minimize my deficiency.

My long-lasting desire to enter the FBI has been driven by an intense desire to make a
meaningful contribution to both my community and country, to have a positive impact in
people's day-to-day lives, and to be motivated by goals that are not based purely on monetary
gain.  As my work experience and education in the accounting and finance field is extensive, I
am confident that I can make a significant contribution to investigations in the increasingly
complex financial environment.

I am sure that the premier law enforcement agency in the U.S. receives numerous applications
from worthy candidates on a daily basis.  However, I am certain that I can make a contribution
well above the average.

If there is any additional information that would assist you in considering my request, please
contact me.

Thank you for your time and consideration.

Sincerely,


James N. Patnaude
9 Withams Road
Newark, DE  19711
(302) 737-3344

JNP:cg
Attachments
h:\fbi.jnp

# EXHIBIT 22



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D. C.  20535

June 7, 1996

Mr. James N. Patnaude
9 Withams Road
Newark, Detroit   19711

Dear Mr. Patnaude:

Your letter to Director Freeh, dated May 25, 1995, has been forwarded to me for a response.

Your application has again been reviewed and careful consideration given to your employment request.  I must advise, however, that our previous decision not to offer you an appointment remains the same.

Your interest in employment with the FBI has been appreciated.

Sincerely yours,

Richard Hildreth, Jr., Chief
Applicant Recruiting and
  Background Section
Personnel Division

# EXHIBIT 23



**U.S. Department of Justice**

Federal Bureau of Investigation

Washington, D. C. 20535-0001

November 10, 2004

PERSONAL

Mr. James N. Patnaude
9 Withams Road
Newark, Delaware 19711

Dear Mr. Patnaude:

This letter serves to advise you of my decision to remove you from the Federal Bureau of Investigation (FBI) as an Intelligence Analyst GS-0132-11, 03-BA-B75, effective upon your receipt of this letter. This action is based on the decision of the Security Programs Manager, Charles S. Phalen, to revoke your Top Secret (TS) clearance effective March 18, 2004.

Although a reconsideration request of the original revocation decision was filed with the Security Clearance Review Panel (SCRP), the panel determined that the revocation should be upheld. Consequently, by letter dated July 15, 2004, you were advised of this decision. This letter also advised of your right to appeal the decision of the SCRP to the U.S. Department of Justice, Access Review Committee (ARC) within 30 days of your receipt of that decision. You appealed the SCRP decision to the ARC, however, on September 21, 2004, the ARC unanimously affirmed the FBI's decision to revoke your "Top Secret" security clearance. This concludes the appeal process and no further action will be taken regarding this matter.

It has been a longstanding, essential condition of employment that employees of the FBI be able to obtain and maintain a TS security clearance. As your TS clearance has been revoked, you are not allowed access to controlled FBI space. As such, you do not meet an essential condition of employment and are hereby removed from the rolls of the FBI.

Mr. James N. Patnaude

        Should you require any additional information or have questions concerning this matter, please contact Deborah Toomey, Human Resources Specialist, Performance Recognition and Awards Unit, (202) 220-9052.

                    Sincerely yours,

                    Mary B. Hannagan
                    Deputy Assistant Director-
                    Human Resources Officer
                    Administrative Services
                        Division

**EXHIBIT 24**



U.S. Department of Justice

Federal Bureau of Investigation

Washington, D. C. 20535-0001

December 21, 2004

PERSONAL

Mr. James N. Patnaude
9 Withams Road
Newark, Delaware 19711

Dear Mr. Patnaude:

This letter is in response to your December 1, 2004, letter received by the Performance, Recognition, and Awards Unit, via facsimile the same day. You stated that you had not received all the documentation that is required when an employee is dismissed.

By letter dated November 10, 2004, and delivered to you via FedEx on November 11, 2004, you were advised of the decision to remove you from the rolls of the FBI effective upon your receipt of the letter, based upon having your Top Secret clearance revoked. Enclosed with the November 10, letter, was a Standard Form-8, Notice to Federal Employee About Unemployment Insurance, which we are required to provide you; and a complete separation package will also be forthcoming shortly under separate cover. You are advised that any request for documentation regarding either the suspension or revocation of your security clearance should be addressed to the Security Division.

If you have any questions regarding the above, please contact Deborah Toomey, Human Resources Specialist, PRAU, at (202) 220-9052.

Sincerely yours,

Mary B. Hannagan
Deputy Assistant Director-
Human Resources Officer
Administrative Services
   Division

## CERTICATE OF SERVICE

I, James N. Patnaude, hereby attest under penalty of perjury that on 31 August 31, 2006, I caused one (1) copy of PLAINTIFFS RESPONSE TO UNITED STATES DISTRICT JUDGE SUSAN L. ROBINSONS ORDER DATED 31 JULY 2006 to be served by hand at the following address:

Seth M. Beausang
U.S. Attorney's Office
1007 Orange Street, Suite 700
P.O. Box 2046
Wilmington, Delaware 19899-2046
(302) 573-6277
(302) 573-6220 (Fax)

James N. Patnaude
31 August 31, 2006